**MONSANTO COMPANY**

v.

**ROHM AND HAAS COMPANY.**

Civ. A. No. 68–1269.

United States District Court,
E. D. Pennsylvania.

Feb. 17, 1970.

As Amended March 2 and March 4, 1970.
Supplemental Opinion May 21, 1970.

Wolfe, Hubbard, Voit & Osann, by C. Frederick Leydig, Phillip H. Mayer, John Rosenquist, Chicago, Ill., for plaintiff.

Connolly, Bove & Lodge, by Arthur G. Connolly, Werner H. Hutz, Brereton Sturtevant, Wilmington, Del., for defendant.

### FINDINGS OF FACT, OPINION, CONCLUSIONS OF LAW, AND ORDER.

MASTERSON, District Judge.

### A. NATURE OF ACTION AND JURISDICTION

1. Plaintiff (hereinafter "Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri. Defendant (hereinafter "Rohm and Haas") is a Delaware corporation with its principal place of business

in Philadelphia, Pennsylvania. (Final Pre-Trial Order, p. 1).[1]

2. This action arises under the patent laws of the United States and this Court has jurisdiction over the parties and the subject matter thereof under 35 U.S.C. § 271 and 28 U.S.C. §§ 1338 and 1400. (PTO, p. 1).

3. The action involves the validity, enforceability and infringement of plaintiff's United States Letters Patent No. 3,382,280, issued May 7, 1968, entitled "3',4'-dichloropropionanilide".[2] (Plaintiff's Exhibit No. 1).[3]

4. Monsanto has sued Rohm and Haas for damages for its alleged infringement of the above patent and also asks for an injunction against further infringement.

Rohm and Haas has counterclaimed, first for a declaratory judgment of invalidity, noninfringement and unenforceability of said patent (paragraphs 12 through 14 of its Answer and Counterclaims), and secondly for an injunction against and damages for plaintiff's allegedly unfair competitive acts against defendant's manufacture and sale of its allegedly infringing compound (paragraphs 15 through 20 of its Answer and Counterclaims). The foregoing injunction would, *inter alia*, prevent plaintiff from asserting the patent in suit against defendant and its customers. Those issues affecting the extent of defendant's liability have been deferred to an accounting, to be had in the event of an appellate or unappealed decision in favor of plaintiff. Those issues arising under defendant's second Counterclaim, paragraphs 15 through 20 in the Answer and Counterclaims, have been deferred to a separate trial to be had after a final determination of the patent infringement issue. (PTO, pp. 1-2).

Rohm and Haas has stipulated that if plaintiff's patent is valid and enforceable, it is guilty of infringement (PTO, Agreed Statement of Contested Legal and Factual Issues) since it manufactures 3,4-DCPA in the Philadelphia area and the compound is formulated into a product called STAM F-34 containing three pounds of 3,4-DCPA per gallon.

Hence, the case before this Court has resolved itself into a legal and factual dispute over the validity and enforceability of Monsanto's patent.

5. The trial in this case was extensive, commencing on November 12, 1969, and concluding on November 19, 1969. The Court entertained argument on the legal issues involved on November 21, 1969. The transcript of the trial record comprises about 1,000 pages and multiple exhibits. The testimony at trial concerned technical matters, and conflicts therein were resolved only after careful consideration of the most credible evidence, both testimonial and documentary.

## B. CHEMICAL FACTS AND DEFINITIONS

6. 3,4-DCPA is a chemical compound which has the structural formula

[A1103]

---

1. Hereafter, this source will be designated "PTO" followed by reference to the particular page or section and paragraph number of the particular attachment from which the Finding is drawn.

2. Hereafter, references to this chemical compound will be made in the shortened forms of "3,4-DCPA" or "propanil".

3. Hereafter, plaintiff's exhibits will be designated "PX" and defendant's exhibits "DX" followed by the number of the particular exhibit in question.

(PTO, Uncontested Fact No. 14, in part)

This chemical is a member of a class of compounds known as "anilides". It is a "dichloro" compound since the 3,-4-DCPA molecule includes two chlorine atoms; hence it is a "dichloroanilide". The numbers 3 and 4 refer to the particular corners of the hexagonal ring of carbon atoms (benzene ring) to which the chlorine atoms are attached. By an accepted chemical numbering system, the corners of this ring may be numbered as indicated in the formula. (PTO, Uncontested Fact No. 15).

7. 3,4-DCPA is marketed extensively by both parties as a selective post-emergence herbicide. (PTO, Uncontested Facts Nos. 41 and 43).

A "selective post-emergence herbicide" is one which, when applied after emergence to a crop and weeds normally associated therewith, substantially destroys the weeds without adversely affecting the crop. (McRae, Notes of Trial Testimony 304).

8. A "homolog" of 3,4-DCPA is a chemical compound of the same series as 3,4-DCPA, whose structure differs from 3,4-DCPA in that it contains a different number of $-CH_2-$ groups. A "higher" homolog of 3,4-DCPA has more $-CH_2-$ groups, and a "lower" homolog has fewer $-CH_2-$ groups. When a homolog of 3,4-DCPA differs in structure from 3,4-DCPA by only one more or one less $-CH_2-$ group, it is an "adjacent" or "next" homolog of 3,4-DCPA. (PTO, Uncontested Fact No. 29).

9. 3',4'-dichloroacetanilide[4] has the structural formula

[A1104]

It is the adjacent or next lower homolog of 3,4-DCPA since it differs in structure solely by having one less $-CH_2-$ group. (PTO, Uncontested Fact No. 30).

10. An "isomer" of 3,4-DCPA is a chemical compound having the same composition as 3,4-DCPA, i. e., the same kinds and numbers of atoms, but with those atoms differently arranged in the molecule. A "ring position" isomer of 3,-4-DCPA is a chemical compound having the same basic propionanilide structure and number of chlorine atoms attached to the benzene ring, but having at least one of the chlorine atoms affixed to a different corner of the benzene ring. (PTO, Uncontested Fact No. 31).

11. 2',4'-dichloroproprionanilide and 2',5'-dichloropropionanilide are ring position isomers of 3,4-DCPA and have the following formulae, respectively

[A1105]

(PTO, Uncontested Fact No. 32)

12. An "analog" of 3,4-DCPA is a compound which is not a homolog or isomer of 3,4-DCPA although its structure is closely related to, but different from, the structure of 3,4-DCPA. (PTO, Uncontested Fact No. 33).

13. 4'-chloropropionanilide has the structural formula

---

4. Hereafter, reference to this chemical compound will be made in the shortened form of "3,4-DCAA".

$Cl-\underset{[A1106]}{\overset{5-6}{\underset{3\ 2}{\diagdown\diagup}}}-\overset{H}{\underset{|}{N}} - \overset{O}{\overset{\|}{C}} - CH_2 - CH_3$

It is an analog of 3,4–DCPA. Accepted technical names for 4' -chloropropionanilide are p-chloropropionanilide and para-chloropropionanilide. (PTO, Uncontested Fact No. 34).

14. 3' -chloropropionanilide has the structural formula

$\underset{[A1107]}{\overset{5-6}{\underset{3\ 2}{\diagdown\diagup}}}-\overset{H}{\underset{|}{N}} - \overset{O}{\overset{\|}{C}} - CH_2 - CH_3$

It is an analog of 3,4–DCPA. Accepted technical names for 3' -chloropropionanilide are m-chloropropionanilide and meta-chloropropionanilide. (PTO, Uncontested Fact No. 35).

15. 2' -chloropropionanilide has the structural formula

[A1108]

It is an analog of 3,4–DCPA. Accepted technical names for 2' -chloropropionanilide are o-chloropropionanilide and ortho-chloropropionanilide. (PTO, Uncontested Fact No. 36).

16. Ortho-, meta- and para- compounds are substituted products derived from benzene in which two of the substituting radicals or groups are structurally placed in certain defined positions on the benzene nucleus. When two substituting groups (A and B) are in such position that they are attached to adjoining carbon atoms of the benzene nucleus, they are said to be in ortho- or o-position to each other. If A and B are so attached that they have a third carbon atom of the nucleus between them, a meta- or m- compound results. If A and B are attached to opposite atoms in the nucleus (two other carbon atoms between them), a para- or p- compound results. The following formulae are illustrative:

ortho meta para

(PTO, Uncontested Fact No. 37)

## C. THE PATENT IN SUIT

17. The patent in suit, No. 3,382,280, issued May 7, 1968 on an application filed in the Patent Office on February 3, 1967 bearing Serial No. 613,738. (PTO, Uncontested Fact No. 1, in part).

18. The patent in suit contains a single claim which reads "3',4' -dichloropropionanilide". It states that 3,4–DCPA possesses "unusual and valuable herbicidal activity" (PX–1, col. 1, lines 44–55) whereas "related compounds possess little or no herbicidal efficiency" (PX–1, col. 3, line 73). The patent granted is 3,4–DCPA, per se, without restriction to its "unusual and valuable herbicidal activity". If this patent is sustained, it would entitle Monsanto to exclude 3,4–DCPA from the public domain until May 7, 1985. (35 U.S.C. § 154).

19. Monsanto filed two other applications relevant to the case at bar prior to its 1967 application. (DX–2 and DX–3). In each of Monsanto's three applications, Dr. Clarence Huffman was named as the inventor. (PTO, Uncontested Fact No. 5, in part).

20. In 1958, through 1962, Rohm and Haas attempted to patent 3,4–DCPA as a compound and the patent office rejected its claim as unpatentable over the prior art. (See PTO, Uncontested Facts Nos. 49, 60, 61).

## I. MONSANTO'S FIRST APPLICATION.

21. The first Huffman application, Serial No. 661,575 (DX–3), was filed on May 27, 1957. It claimed both the herbi-

cidal compositions of chemical compounds and the use of these compounds to destroy undesired plants. (DX–3, pp. 21–24).

22. At no time during the prosecution of Huffman's first application were any claims presented to the Patent Office directed to a chemical compound per se. (PTO, Uncontested Fact No. 8). Such claims were included in a draft of this application but were omitted by Monsanto from the application as filed. (DX–54; Peterson, designated Deposition 175–176;[5] Huffman, Notes of Trial Testimony 181–182, 185–186).[6]

23. This application disclosed a large class of 3,4-dihalogenated anilides, including 3,4–DCPA, and also stated that the members of said class possessed "unusual and valuable herbicidal activity." (PTO, Uncontested Fact No. 7, in part). This 1957 application asserted that each compound included within the huge class of anilides (McRae, N.T. 333–34; Price, N.T. 492) possessed "unusual and valuable herbicidal activity" (DX–3, p. 2, lines 1–4), while related compounds possessed "little or no herbicidal efficiency" (DX–3, p. 12, lines 1–19). Huffman confirmed this "unusual and valuable herbicidal activity" of all compounds included within the broad claim language (Huffman, N.T. 144, 156–8, 166–71, 174).

24. A somewhat narrower class of 3,4-dichloroanilides comprising about one hundred compounds was also disclosed in the 1957 application, each member of which was stated to possess "outstanding utility" as a herbicide (DX–3, p. 3, lines 1–5; Huffman, N.T. 171–2). This class included not only 3,4–DCPA but also its adjacent lower homolog, 3,4–DCAA.

25. The 1957 application not only stated that all the 3,4–dihaloanilides disclosed had "unusual and valuable herbicidal activity" but also referred to the activity as post-emergence or pre-emergence, selective or non-selective—"just

any and all kinds of activity" (Huffman, N.T. 144–45).

26. The United States Patent Office, in four separate office actions, rejected all of Huffman's claims, both those embracing methods of using and compositions containing 3,4–DCPA, as unpatentable over the prior art disclosures (DX–3, pp. 26–7, 34–5, 45–6, 51–2).

II. MONSANTO'S SECOND APPLICATION.

27. On May 8, 1961 Monsanto filed a second application in Huffman's name as a continuation-in-part of its 1957 application and thereupon abandoned the latter. This second application also claimed both the compositions of herbicidal compounds and the use of those compounds to destroy undesired plants. (DX–2).

28. The 1961 application disclosed a large class of 3,4–dihalogenated anilides, including 3,4–DCPA and 3,4–DCAA, and also stated that the members of said class possessed "unusual and valuable herbicidal activity", and that 3,4–DCPA, 3′4′-dichloroisobutryanilide and 3′4′-dichloromethacrylylanilide were useful as selective post-emergent herbicides for rice. (Uncontested Fact No. 9, in part).

29. Rohm and Haas' South African Patent No. 309/59 describing and claiming 3,4–DCPA as selective, post-emergence herbicide was granted in May, 1959. Monsanto had obtained a copy of this patent by September 10, 1959. (PTO, Uncontested Fact No. 22). In January, 1960, representatives of Monsanto attended the Southern Weed Conference where a report by Dr. Roy Smith of the U. S. Department of Agriculture was given describing 3,4–DCPA as a selective, post-emergence herbicide for the control of weeds in rice. A printed report by Dr. Roy Smith, entitled "Proceedings, Thirteenth Annual Meeting of the Southern Weed Conference", describing 3,4–DCPA as a selective post-emergence herbicide for the control of weeds

---

5. Hereafter, depositions designated by the parties as part of the record in this case will be referred to as "Dep."

6. Hereafter, references to the Notes of Trial Testimony will be abbreviated "N.T."

in rice was published in April, 1960. (PTO, Uncontested Fact No. 23). Monsanto learned as early as April 7, 1961 that Rohn and Haas has sold 3,4–DCPA as a selective, post-emergence herbicide. (PTO, Uncontested Fact No. 26).

30. The 1961 Huffman application was filed more than twenty months after issuance of Rohm and Haas' South African patent, more than fifteen months after Monsanto attended the Southern Weed Conference, thirteen months after publication of the weed conference proceedings and one month after Monsanto had learned that Rohm and Haas had begun selling 3,4–DCPA as a post-emergence, selective herbicide. (Findings of Fact Nos. 27 and 29).

31. The Patent Office rejected the claims of this second application as unduly broad and unpatentable over the prior art (DX–2, pp. 29–31, 44–46).

32. No claim in Dr. Huffman's second application as filed was directed to a chemical compound per se. On November 14, 1962, the Patent Office suggested to Monsanto an allowable claim "for purpose of interference", which claim corresponded to claim 9 of Wilson et al's patent application Serial No. 96,089 filed March 16, 1961 by Wilson and McRae, assignors to Rohm and Haas. This was the first claim to a method of using or a composition containing 3,4–DCPA which was indicated as allowable either to Monsanto or Rohm and Haas during the prosecution of any of their patent applications. The claim read as follows:

"A method for selectively inhibiting growth of undesirable plants in an area containing growing undesirable plants in an agronomic crop, which comprises applying to said area 3,4– dichloropropionanilide at a rate of application which inhibits growth of said undesirable plants and which does not adversely affect the growth of said agronomic crop." (PTO, Uncontested Fact No. 10)

33. Interference No. 93,751 was declared August 21, 1963, to determine who was the first to invent the method of claim recited in Finding of Fact 32 (PTO, Uncontested Fact No. 62, in part). During the interference, in conjunction with its motion to add counts, Monsanto submitted an amendment on March 30, 1964, to include in its 1961 application the claim "the compound 3',4' -dichloro-propionanilide" (claim 24) (DX–2, p. 63). This amendment was not entertained by the patent office which denied the motion to add (DX–2, p. 65). Monsanto delayed for almost three additional years, i. e., until it filed DX–1, the third Huffman application, in February 1967, any attempt to patent 3,4–DCPA as a compound.

III. MONSANTO'S THIRD APPLICATION.

34. The third Monsanto application, which issued as the patent in suit, was filed on February 3, 1967. This third application was examined by a different examiner than its two previous applications (Cole, N.T. 788).

35. Unlike the two earlier Monsanto applications, the 1967 one asserted that only 3,4–DCPA had "unusual and valuable herbicidal activity" (DX–1, pp. 1– 2). Monsanto asserted that the activity of this new compound was "surprising" because "related compounds possess little or no herbicidal efficiency" (DX–1, p. 7, lines 1–2). Monsanto listed "some" of these related compounds in the 1967 application (DX–1, p. 7), but omitted reference to more closely related compounds described in its earlier applications as having "unusual and valuable herbicidal activity". (Huffman, N.T. 100–101, 160–4, 169–70).

36. The new Examiner rejected the single compound claim in the 1967 Monsanto application as obvious over the prior art disclosing homologs and isomers of 3,4–DCPA, including 3,4–DCAA and 2,4- dichloropropionanilide (DX–1, p. 19).

37. In its attempt to persuade the Patent Office that 3,4–DCPA was patentable over such prior art compounds, Monsanto, in the course of prosecuting this third application, filed on or about November 9, 1967, the affidavit of Dr.

Robert F. Husted. (DX–1, pp. 47–50). This affidavit was drafted by one of Monsanto's patent attorneys and was based upon tests performed by Dr. Husted on about 20 plant species at three different rates of application per acre. The results of these tests were reported. by Husted to counsel by letter with attached charts (DX–22). The affidavit only reports the results of tests of *10 compounds applied to 11 plant species at the rate of 2 lbs. per acre of application.* The results were that 3,4–DCPA completely killed or severely injured 9 of the 11 species and failed to have any effect on only 2. By contrast, 8 other compounds were reported to have no effect on any of the 11 plants and two other compounds, one of them 3,4–DCAA, either had very slight effect or no effect.

A comparison of the affidavit (DX–1, pp. 47–50) with the letter and charts forwarded to counsel by Husted (DX–22) reveals the following (Cole, N.T. 787–813):

1. The affidavit states that 3,4–DCPA completely kills radishes at 2 lbs. per acre, earning a "4" rating (DX–1 p. 49). The charts attached to Husted's letter to counsel reveal that 3,4–DCPA only has moderate herbicidal value at 2 lbs. per acre, earning a "2" rating (DX–22, last page).

2. The charts in DX–22 indicate that at 2 lbs. per acre 3,4–DCAA has complete kill value on pigweed, earning a rating of "4" (DX–22, next to last page). The affidavit completely omits the results of this test. (DX–1, p. 49).

3. The affidavit fails to contain the results of tests where a compound other than 3,4–DCPA attained a rating higher than "1". (DX–1, p. 49). The second to last chart in DX–22 reveals that at 2 lbs. per acre, three compounds other than 3,4–DCPA achieved a rating of "2", which means a moderate herbicidal value.

4. The affidavit reports that 3,4–DCPA at 2 lbs. per acre achieved a "3" or "4" rating on all plant species except two where it achieved a "O" rating (DX–1, p. 49). DX–22 reveals that at 2 lbs. per acre

3,4–DCPA had a rating of less than 3 on several plant species, which results were not reported in the affidavit.

5. The affidavit fails to contain the results of Husted's testing at other than 2 lbs. per acre. (DX–22, first four charts). These show that 3,4–DCPA is somewhat less active at rates other than 2 lbs. per acre.

In addition to the above, the Huffman and Allen article (DX–8) reports the results of tests on various crops at 8 lbs. per acre of application and shows that 3,4–DCAA exhibits high herbicidal activity. This article, as well as the results of the tests in DX–22, were not brought to the attention of the patent examiner (Cole, N.T. 811).

These omissions were intentionally and deliberately made to mislead the patent office into believing that 3,4–DCPA had outstanding herbicidal value as compared to related compounds. The Husted affidvait failed to state facts necessary to be stated in order to make Monsanto's representation to the patent office, taken as a whole, not misleading.

38. About 3 months after the filing of the Husted affidavit, on February 20, 1968, Monsanto was notified that its claim to 3,4–DCPA was allowed by the Patent Office (DX–1, p. 57), and on May 7, 1968, the patent was issued.

D. THE PRIOR ART.

39. The following are patents and printed publications which were patented or published before May 27, 1956:

a) Bienert Patent No. 2,133,340, dated October 18, 1958 (DX–68)

b) FIAT Final Report No. 1313, dated February 1, 1948 (PB 85172), cover page and pp. 273, 321 and 575 (DX–69)

c) Fontein, Recueil Des Travaus Chimiques Des Pays Bas 47, pp. 635–667 (1928) (DX–70)

d) Chattaway, J. Chem. Soc. Trans. 81, pp. 637–44 (1902) (DX–71)

e) Beilstein, Handbuch der Organischen Chemie, 4th Ed., Vol. 12, pp.

622–29, Berlin, Springer (1929) (DX–72)

f) Shaw et al, "Weeds", Vol. 2, pp. 43–65 (1953) (DX–73)

g) "Plant Regulators" CBCC Positive Data Series No. 2, June 1955, Publication 384, cover page and pp. a, b, c, l, 39 and 40 (DX–74)

h) Todd Patent No. 2,655,445, dated October 13, 1953 (DX–75)

i) King Chemicals Evaluated as Insecticides and Repellents at Orlando, Fla., U.S. Department of Agriculture Handbook No. 69, pp. 2, 3, 24, 25 and 285, Wash., D.C. U. S. Government Printing Office, 1954 (DX–83).

(PTO, Uncontested Fact No. 39)

40. These references do not recite the specific name "3′,4′–dichloropropionanilide" as such, nor do they portray the following specific chemical structure:

Cl—⬡—N–C–CH₂–CH₃ (with H, O above)

[A1110]

(PTO, Uncontested Fact No. 28, in part)

41. All six of the homologs, isomers, and analogs of 3,4–DCPA set out in Findings 9, 11, 13, 14 and 15 above, as well as seven others, were specifically described in the published prior art before May 27, 1956. (PTO, Uncontested Fact No. 38). These homologs, isomers and analogs implicitly describe 3,4–DCPA and its formula to one skilled in the art (McRae, N.T. 341–346; Price, N.T. 544–62, 565).

42. The prior art homologs, isomers and analogs described in the preceding Findings rendered the chemical compound 3,4–DCPA structurally obvious to a person having ordinary skill in the art at the time the alleged invention was made. (McRae, N.T. 341–46; Urry, N.T. 867–68).

43. Bienert specifies that the acylamino group can be either acetylamino or propionylamino (DX–68, p. 1, col 2, lines 1–12). The small number of so-described 3,4–dichlorobenzenes would, to a chemist skilled in the art, include 3,4–DCPA and 3,4–DCAA, although these specific formulae were not recited by Bienert. The procedure taught in this patent to make the described pigments can start with either 3,4–DCAA as shown by FIAT Final Report No. 1313, dated February 1, 1948 (DX–69), or with 3,4–DCPA, the next higher homolog of 3,4–DCAA, to produce phthalocyanine pigments having "extremely close" properties (Price, N.T. 522–33; Urry, N.T. 901–02). 3,4–DCPA was used by Dr. Price in the reaction disclosed by FIAT and a pigment was obtained having properties "very similar" to those of the pigment made from 3,4–DCAA.

(Price, N.T. 534–39).

44. Chattaway, J. Chem. Soc. Trans. 81 (1902), pages 637–644, (DX–71), describes the migration of a chlorine atom from the nitrogen to the para and then the ortho positions in propionanilide and chlorinated propionanilides, including that derived from 3–chloroaniline wherein the meta position is already substituted by chlorine (page 637). The products obtainable by Chattaway's method constitute a small group of ten chloropropionanilides, one of which is 3,4–DCPA obtained from 3–chloroaniline. (Price, N.T. 548–49, 552). The reaction that Chattaway gives is very similar to the one that can be applied to the production of propanil. (Urry, N.T. 904–05).

45. Fontein, Recueil Des Travaus Chimiques Des Pays Bas 47 (1928), pages 635–667, (DX–70), describes the reaction velocity measurement of intramolecular changes in a group of compounds having the formula:

[A1111]

wherein X is chlorine or bromine, A is formyl, acetyl, propionyl, butyryl or benzoyl, and R is hydrogen, chloro, bromo or methyl (page 638). The changes under study are migration of X from the nitrogen atom (N) to the 4- or para-position on the phenyl nucleus thereby producing compounds having the formula:

[A1112]

wherein X, R and A are defined as above (pages 644, 654, 657, 663). Fontein indicated a preference for compounds of this second formula wherein X is chlorine and included specific reference to the production of 3,4–DCAA (page 663). (Price, N.T. 560; Urry, N.T. 905). Using propionyl in lieu of acetyl, 3, 4–DCPA will be obtained (Price, N.T. 560–61; Urry, N.T. 906–07).

46. 3,4–DCAA is a prior art compound, specifically described in the literature before Huffman first prepared 3,4–DCPA.

47. Both 3,4–DCAA and 3,4–DCPA have properties which make them useful in the production of pigments (See Finding of Fact No. 43, *supra*).

48. Both 3,4–DCAA and 3,4–DCPA have herbicidal properties (See DX–22; Findings of Fact Nos. 23, 24 and 37, *supra*).

49. The use of 3,4–DCAA and 3,4–DCPA as selective post-emergent herbicides was not revealed or in any way suggested in the prior art before May 27, 1956.

## OPINION

The parties have submitted an agreed statement of contested legal issues in this case. (PTO, Agreed Statement of Contested Legal and Factual Issues). We will decide the following issues:[7]

(1) Was the chemical compound 3,4–DCPA *obvious* within the meaning of 35 U.S.C. § 103?

(2) Did Monsanto *deliberately misrepresent or withhold material facts in order to mislead the patent office* during the prosecution of the patent in suit so as to render the patent invalid or unenforceable?

(3) Did Monsanto *constructively abandon* its application for a patent or was it guilty of *laches* in asserting any right it had to a patent?

(4) Was the chemical compound 3,4–DCPA *anticipated* within the meaning of 35 U.S.C. § 102(a) and (b)?

(5) Did Monsanto fail to comply with 35 U.S.C. § 112?

## I. OBVIOUSNESS

Under 35 U.S.C. § 103, a patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains". Within the framework of this general rule, a line of cases has developed concerning the obviousness of an allegedly new chemical compound where an isomer, analog or homolog of that compound has been disclosed in the prior art.

The genesis of these cases is Application of Henze, 181 F.2d 196, 37 CCPA 1009 (1950)[8]. In that case, the applicant sought to patent a certain chemical compound over its prior art homolog because the claimed compound was found to possess a new property. The prior art homolog also possessed this "new" property, though the property was not described in the prior art. The Court of Customs and Patent Appeals affirmed the rejection of the applicant's claim, holding that a presumption of un-

---

7. The only issue we are not deciding is whether Dr. Huffman was the inventor of the compound in question.

8. See also In re Haas, 141 F.2d 122, 31 CCPA 895 (1944).

patentability arises where the homolog of a claimed compound is disclosed in the prior art. To rebut this presumption it must be shown "that the claimed compound possesse[d] unobvious or unexpected beneficial properties not actually possessed by the prior art homologue. It is immaterial that the prior art homologue may not be recognized or known to be useful for the same purpose or to possess the same properties as the claimed compound." 181 F.2d at 201.

 The theory underlying the *Henze* rule is basic to the law of patents, namely that an old product with a new use cannot be patented but rather the new use must be patented. More specifically, the theory of *Henze* is that a compound and its homolog are so close chemically that where the homolog is disclosed in the prior art and has *in fact* the "new" property of the claimed compound, the claimed compound is in the public domain for all purposes and can no longer be patented as a compound regardless of newly discovered properties. The applicant in this situation is protected by the patent law, however, because he may patent the newly discovered use.

Numerous cases have arisen since *Henze* with similar factual situations.[9] Plaintiff argues that some of these cases, particularly In re Papesch, 315 F.2d 381, 50 CCPA 1084 (1963) and Commissioner of Patents v. Deutsche Gold-und-Silber-Scheideanstalt Vormals Roessler, 130 U.S.App.D.C. 95, 397 F.2d 656 (1968), have so watered down *Henze* that it is no longer the applicable law. While we find that the cases subsequent to *Henze* are not easily reconcilable, if reconcilable at all, we disagree with plaintiff's contention and conclude that *Henze* is still the controlling law in this area.

 This conclusion is buttressed by the recent case of In re Mod, 408 F.2d 1055 (C.C.P.A.1969). In that case, the applicants sought to patent certain compounds over a prior art disclosure of isomers and homologs on the ground that the claimed compounds possessed a novel property not disclosed by the prior art. The patent examiner found that the prior art homologs and isomers possessed the same novel property as the claimed compounds and, relying on *Henze*, rejected the applicants' claims as obvious. The Board of Patent Appeals affirmed the examiner. The Court of Customs and Patent Appeals affirmed the Board of Patent Appeals on the grounds that (1) the claimed compounds and the prior art compounds possessed a close structural relationship *and* (2) the claimed compounds possessed the same properties as those for which the prior art compounds were useful. This decision reaffirms at least the theory underlying *Henze* and would appear to add another factor to consider in this area, namely whether the new compound possessed the same property which the prior art compound was known to possess. *Henze*, it will be remembered, held that the important factor in deciding patentability was whether the prior art compound possessed the same "new" property as the claimed compounds, though this "new" property was not disclosed in the prior art. *Mod* would appear to take the other side of that coin in relying on the fact that the allegedly new compound has the same property for which the prior art compounds were known. In final analysis, the combined effect of *Mod* and *Henze* seems to be that a compound is unquestionably in the public domain and cannot be patented, even though it possesses properties not disclosed by the prior art, if:

(1) the claimed compound is structurally obvious from prior art homologs, isomers and analogs;

(2) the claimed compound possesses the same property for which the prior art compounds were useful; and

9. Many of these cases are cited and discussed in In Re Papesch, 315 F.2d 381, 51 CCPA 1084 (1963), and Commissioner of Patents v. Deutsche Gold-und-Silber-Scheideanstalt Vormals Roessler, 130 U.S.App.D.C. 95, 397 F.2d 656 (1968). There is little we can add to these exhaustive opinions.

(3) the prior art compounds in fact possess the newly discovered property of the claimed compound.

▮ In the case before us, all three of the above factors are present: (1) 3,4–DCPA is structurally obvious from its prior art homolog, 3,4–DCAA, as well as from its isomers and analogs (Finding of Fact No. 42);

(2) Both 3,4–DCAA and 3,4–DCPA are useful in the production of pigments (Findings of Fact Nos. 43 and 47);

(3) Both 3,4–DCAA and 3,4–DCPA have herbicidal properties (Finding of Fact No. 48).

Under these circumstances we hold that the compound 3,4–DCPA is "obvious" within the meaning of 35 U.S.C. § 103. As a compound 3,4–DCPA was for all purposes in the public domain and cannot be patented as a compound. As we have noted above, the inventor of the novel property of the compound is not without recourse since he may patent the use of 3,4–DCPA as a selective post-emergence herbicide.

▮ Plaintiff further argues that even though 3,4–DCPA and 3,4–DCAA both have herbicidal properties, 3,4–DCPA is so far superior to 3,4–DCAA in terms of usefulness as a herbicide that plaintiff's patent is justifiable on this ground. While this argument may be compelling in the market place, we do not find it compelling as a matter of patent law in this case. In *Henze* and In Re Coes, 173 F.2d 1012, 36 CCPA 1067 (1949), the courts held that the unobvious properties of the claimed compound must be "markedly superior" to the prior art compounds, and not merely different in degree, in order to justify a patent on the compound. The reason for this rule was stated by *Henze* as follows: "[T]he characteristics normally possessed by members of a homologous series are principally the same, and vary but gradually from member to member. Chemists knowing the properties of one member of a series would in general know what to expect in adjacent members".

181 F.2d at 201. We find both the rule and reason for it applicable here. Monsanto, in its earlier applications, stated that 3,4–DCAA had unique herbicidal value (see Findings of Fact Nos. 24 and 28). Moreover, Monsanto by its very own tests shows that 3,4–DCAA has some herbicidal value (see DX–8 and DX–22), depending on the rate of application and the plant species to which it is applied. Hence, the difference between 3,4–DCPA and 3,4–DCAA is only one of degree and the value of each as a herbicide depends to a large extent on rate of application and the plant to which it is applied. A patent monopoly on the substance of 3,4–DCPA cannot be justified because it is a better or more useful herbicide at some rate of application on certain plants.

As we have noted above, plaintiff's argument that *Henze* is no longer the controlling law in this area is primarily based on the cases of In Re Papesch, supra, and the *Deutsche* case, *supra*. We feel that these cases are distinguishable from *Henze* and *Mod*. Those cases dealt with the situation of the claimed compound being structurally obvious from the prior art compounds. They did *not* involve the similarity of properties which we have before us. *Papesch* and *Deutsche* stand for the proposition that the structural obviousness of the claimed compound from prior art compounds is insufficient *by itself* to find that the subject matter as a whole is obvious within the meaning of 35 U.S.C. § 103. As we have discussed above, this case is more than just a case of structural obviousness.

Moreover, even if this were only a case of structural obviousness, we would be disposed to hold that this in and of itself should preclude issuance of a patent. It is basic to the grant of a patent that the scope of a patent should not exceed the scope of invention. If what makes a structurally obvious chemical substance patentable is the new and unobvious properties or uses discovered by the first person to compound the substance, the

discoverer should have protection on what he discovered, *i. e.,* the new properties of the substance, but should not be entitled to a 17-year monopoly on the substance itself. To say that a person who has discovered a new use for a structurally obvious compound, which compound would not have been entitled to any patent protection absent the new use, should receive a patent on the compound itself is to extend the patent monopoly far beyond the reason for its existence. We think that the purposes of the patent law will be adequately served if patents on compounds which are structurally obvious from the prior art are limited to method patents directed to the new and useful characteristic or property which is the essence of the discovery or invention. In this case the actual advance of the art is the discovery of 3,4–DCPA as a herbicide. This fact was neither obvious nor predictable from the prior art. To a reasonably skilled chemist, the chemical formula and structure of 3,4–DCPA was obvious from the formula and structure of 3,4–DCAA. Such a chemist would also expect both compounds to have similar properties. Both compounds can be easily produced by using known chemicals and methods of synthesis. Hence there was nothing characteristic of invention in the routine compounding of 3,4–DCPA. Dr. Huffman himself testified that 3,4–DCPA was synthesized by his assistant using old and known methods and compounds (Huffman, N.T. 57). The "invention" was discovering 3,4–DCPA's peculiar characteristics as a herbicide. The question of whether Dr. Huffman is entitled to a process patent on the use of 3,4–DCPA as a herbicide is now before the patent office in an interference involving the same parties and is not before this court.

## II. MISREPRESENTATION

Defendant secondly alleges that Monsanto's patent is invalid because Monsanto withheld from the patent office material facts which made its application, taken as a whole, misleading. More specifically, Rohm and Haas alleges that Monsanto, in its attempt to persuade the patent office of the unobviousness of 3,4–DCPA as a herbicide, deliberately failed to present complete data with respect to the herbicidal efficacy of close-by related compounds, thereby intending to mislead the patent office. These facts are material, it is argued, because had they been presented no patent would have issued.

■■■ The facts most relevant for the purposes of this issue may be found in Finding of Fact No. 37.[10] It is our conclusion that Rohm and Haas has proved that the Husted affidavit, filed on November 9, 1967, presented to the patent office incomplete data, carefully and intentionally chosen to support the position that 3,4–DCPA possessed unique herbicidal properties not possessed by closely related compound. Although the affidavit contains no affirmative misrepresentation and is accurate so far as it goes,[11] it is misleading, and was intended to be misleading, in that it fails to state facts known to the applicant which were inconsistent with its position that propanil is a superior herbicide. It is, in short, composed of half-truths. The facts not stated would tend to show that closely related compounds do have more than just slight herbicidal value depending on the rate of application and the plant species to which the compounds are applied. The omitted facts also tend to show that 3,4–DCPA is not so clearly superior as a herbicide to closely related compounds. For example, one omitted

10. See also Finding of Fact No. 35.

11. We have concluded that there is insufficient evidence to prove that Monsanto intentionally made false statements of fact to the patent office. Although the Husted affidavit states that 3,4–DCPA completely kills radishes and DX–22 reveals

that it only has moderate herbicidal value, we cannot say that this misstatement was intentional. However, there is sufficient evidence to prove that Monsanto intentionally omitted material facts and that it thereby intended to mislead the patent office.

test result showed that 3,4–DCAA had a complete kill on pigweed at 2 lbs. per acre of application, just as 3,4–DCPA did. These facts are material because if these closely related compounds, particularly 3,4–DCAA, possess little or no herbicidal value, then the *Henze* doctrine might become inapplicable and a patent on the compound 3,4–DCPA might properly be granted notwithstanding the disclosure of closely related compounds in the prior art.[12] As we discussed above, *Henze* precludes a patent compound where a closely related compound disclosed in the prior art actually possesses the new and unobvious property of the claimed compound. Monsanto, by the Husted affidavit, attempted to show that closely related compounds do not possess unique herbicidal properties. The facts not stated were, therefore material. Unquestionably the patent office also thought they were material because it placed substantial weight on the Husted affidavit when, after first rejecting the claim, it decided to issue a patent 3 months after the Husted affidavit was filed.[13]

The above facts raise the question of whether a patent is invalid because the applicant intentionally fails to state material facts in order to mislead the patent office. We have decided that this question must be answered in the affirmative.

Under the decisions of the Supreme Court, one who is sued for patent infringement may challenge the validity of the patent on the ground that it was fraudulently procured or because the patentee was guilty of some other inequitable conduct or bad faith in his proceedings before the patent office. Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933). See also Chas. Pfizer & Co. v. FTC, 401 F.2d 574 (6th Cir. 1958), *cert. denied*, 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453 (1969); Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., 218 F.Supp. 1, 46 (D.C.Md.1963), *aff'd*, 327 F.2d 497 (4th Cir.), *cert. denied* 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed. 2d 36 (1964); Union Carbide & Carbon Corp. v. Stuart Laboratories, 194 F.2d 823, 827 (3d Cir.), *cert. denied,* 343 U.S. 967, 72 S.Ct. 1058, 96 L.Ed. 1363 (1952); Monolith Portland Midwest Co. v. Kaiser Alum. & Chem. Corp., 267 F.Supp. 726, 786 (S.D.Cal.1966), *modified on other grounds*, 407 F.2d 288 (9th Cir. 1969). The theory of this defense of fraudulent procurement is the equitable doctrine of "unclean hands" and is rooted in considerations of public policy. As the Supreme Court said in the *Precision Instrument* case at page 816, 65 S.Ct. at page 998:

"A patent by its very nature is affected with a public interest. * * * [I]t is an exception to the general rule against monopolies and to the right to

12. The *Mod* decision, which in our opinion adds another factor to consider in this area, we decided in April of 1969 and therefore after the Husted affidavit. Hence, Monsanto, at the time of the Husted affidavit, was only concerned with the *Henze* line of cases.

13. Although Monsanto insists that any omitted facts were not material, they have stated to the contrary on the record. In their statement of Contested Facts and Issues, included in our Pre-trial Order, Monsanto states that the reason why Rohm and Haas was denied a patent on 3,4–DCPA was because it failed to submit data comparing 3,4–DCPA with closely-related compounds. Monsanto urges that it received a patent because it submitted this data, which showed that propanil had significantly greater qualities as a herbicide than closely-related compounds. It is this very data which is in issue. See PTO, Plaintiff's Statement of Contested Issues of Fact and Law, pp. 5–6, Nos. 15–19.

access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope."

 We have concluded that the decisions of the Supreme Court require the highest degree of scientific candor on the part of patent applicants in their dealings with the patent office. We believe this standard forbids not only the affirmative making of false statements of material fact, but also the suppression of facts known to the applicant which are inconsistent with statements made by the applicant in pursuit of a patent. The patent applicant should be held to the same standard of truthful disclosure to the patent office that Congress has required of the seller of securities to the public. Under the securities law, one who sells or offers securities for sale must not omit to state in his registration statement, prospectus, or any other communication directed to the public any material fact necessary to be stated in order to make the communication taken as whole, not misleading. The same standard of candor should also apply to the patent applicant and, when deliberately violated in order to mislead, should result in the denial of a patent. The 17-year monopoly of a patent is a major exception to our basic concepts of free enterprise and the burden ought to be on the applicant to show that he truly has made a discovery which warrants a monopoly. The patent office should not be put to the trouble of deciding whether to issue a patent on the basis of incomplete and distorted data. It would clearly be against public policy to countenance the issue of a patent based upon an application which omits to state facts which make the application taken as a whole misleading. The plaintiff's intentional failure in this case to state material facts, whereby it misled the patent office, was sufficiently inequitable to invalidate its patent. To distinguish the making of false statements of material fact to the patent office from misleading omissions of material fact would be to invite the kind of deception that occurred here. We conclude that there is no rational basis for a distinction between affirmative misrepresentations and misleading omissions.

 Plaintiff argues, however, that the standards of disclosure under the securities act, even if deliberately breached, should not apply to the patent applicant because the purpose of those standards is to prevent the inexpert investing public from being misled. The patent office, on the other hand, has the expertise necessary to decide whether to issue a patent without requiring complete scientific candor from patent applicants. We find this argument to be without merit for two reasons. First, the public does have an interest in seeing that 17-year monopolies are not given without a full and complete airing of all relevant facts. This public interest cannot be diminished by the fact that it is not as directly involved in the patent process as the investing public is in the process of the sale of a security. Second, the patent office cannot possibly have a detailed technical expertise in every scientific area without relying to some degree on the scientific candor of patent applicants. It cannot be expected to perform tests and experiments to determine whether an applicant's alleged invention is in fact an invention. Further, since patent application proceedings are not ordinarily adversary proceedings, the patent office must rely on the tests and experiments and good faith of the applicant.[14]

14. Appropriate in this regard is the statistical notation by the Supreme Court in Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966) that "the Patent Office is confronted with a most difficult task. Almost 100,000 applications for patents are filed each year. Of these, about 50,000 are granted and the backlog now runs well over 200,000. 1965 Annual Report of the Commissioner of Patents 13–14."

Plaintiff also urges that any omission to state facts on its part was not material to the issuance of a patent. Although we have found the omission to be material, we are compelled to point out that lack of materiality would not necessarily preclude us, as a Court in Equity, from holding the patent in suit invalid. It has been held that affirmative misrepresentations by a patent applicant, made with the intent to deceive, even if not material, is grounds to refuse the enforcement of a patent because the applicant is thereby tainted with unclean hands. Corning Glass Works v. Anchor Hocking Glass Corp., 253 F.Supp. 461 (D.D.Del.1966), *rev'd on other grounds,* 374 F.2d 473 (3d Cir. 1967). The doctrine of unclean hands is equally applicable to the intentional withholding of facts to mislead the patent office. As the Court said in Corning, *supra,* at 470 "Absolute honesty and good faith disclosure is necessary." This rule of absolute candor with the patent office is a salutary one in that it should encourage the applicant, where the materiality of facts is in question, to resolve all doubts in favor of disclosure.

It is our conclusion, therefore, that the patent applicant in processing his application must not omit to state material facts known to the applicant for the purpose of misleading the patent office. If the applicant does, his patent will be invalidated as procured inequitably and contrary to public policy. Moreover, these same equitable and policy considerations compel invalidation of a patent even if the misrepresented or omitted facts are not material, if they are made with the intent to mislead.

## III. CONSTRUCTIVE ABANDONMENT AND LACHES

Defendant further contends that Monsanto's patent is invalid because 3,4–DCPA was in public use and patented as a herbicide in a foreign country more than one year before Monsanto applied for its patent. This contention is based on the following statutory language:

"A person shall be entitled to a patent unless * * * (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." (35 U.S.C. § 102(b)).

The theory of this section is that an inventor "constructively abandons" his right to a patent if his invention has been in public use more than one year before his patent application. See 2 Deller's Walker on Patents, § 136.

Monsanto filed its application for a patent on 3,4–DCPA on February 3, 1967. This application was stated to be a division of its application filed May 8, 1961 which in turn was a continuation of its application filed May 27, 1957 which was abandoned (DX–1, p. 1). 3,-4–DCPA had been on the market more than one year before February 3, 1967 (Finding of Fact No. 30). In addition, Rohm and Haas had secured a foreign patent on 3,4–DCPA as a selective, post-emergence herbicide in May, 1959 (Finding of Fact No. 29). This was more than one year before Monsanto's application of May 8, 1961. Hence, the issue we must decide is whether Monsanto is entitled to claim the May 27, 1957 filing date of its first application under section 102(b) for the purposes of determining the one-year statutory period. If we conclude that it is entitled to the May 27, 1957 filing date, its patent cannot be invalidated under section 102(b). If, however, we conclude that either February 3, 1967 or May 8, 1961 is the filing date, Monsanto's patent is invalid.

We have concluded that Monsanto is entitled to the May 27, 1957 filing date and therefore its patent is not invalid under the public use provision of section 102(b). Under 35 U.S.C. § 120 an inventor is entitled to the filing date of an earlier patent application if: (1) the invention patented is disclosed in the earlier application in the manner pro-

vided in the first paragraph of 35 U.S.C. § 112; (2) the inventor is the same; (3) the application is filed "before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application"; and (4) if the application contains a specific reference to the earlier filed application. See Technicon Instruments Corp. v. Coleman Instrument Corp., 385 F.2d 391 (7th Cir. 1967). Monsanto has met these four requirements.

First, Monsanto's 1957 application describes the invention patented in a manner which complies with 35 U.S.C. § 112. Section 112 requires "a written description of the invention, and the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor for carrying out his invention." By our examination of the 1957 application (DX–3), we have concluded that 3,4–DCPA is disclosed in compliance with section 112.

Secondly, Dr. Huffman is named as the sole inventor in all three of Monsanto's applications.

Thirdly, Monsanto's 1967 application was filed before the "patenting or termination of proceedings on its first application or on an application similarly entitled to the benefit of the filing date of the first application." Although Monsanto's first application was abandoned before its 1967 application, there was no "patenting or termination of proceedings" on its 1961 application which, we find, would also be entitled to the filing date of its 1957 application.

Lastly, Monsanto's 1967 application contains a specific reference to each of its two previous applications (DX–1, p. 1).

Hence, we have concluded that Monsanto is entitled to the May 27, 1957 filing date for the purpose of determining whether it "constructively abandoned" any right it may have had to patent 3,4–DCPA.

Notwithstanding our above conclusion, Rohm and Haas urges that even if Monsanto did not abandon any right it had to patent 3,4–DCPA, it is guilty of such inexcusable delay in asserting that right that its patent is invalid for laches. Rohm and Haas argues that the twelve year delay from 1955, when Monsanto alleges Huffman invented 3,4–DCPA,[15] to 1967, when Monsanto filed its patent application, precludes the issuance of a patent to Monsanto where 3,4–DCPA had been in public use since 1961 and where no reasonable excuse is offered by Monsanto to explain such delay. The theory of the requirement of prompt assertion of a right to a patent is that such inaction unduly postpones the time when the public would be entitled to the free use of the invention and thus defeats the policy of the patent law. See 2 Deller's Walker on Patents, § 135. In applying this theory to this case, we find Monsanto guilty of laches in asserting any right it had to a patent on the compound 3,4–DCPA.

Both Monsanto and its competitor Rohm and Haas have marketed 3,4–DCPA as a herbicide since about 1961 and both have attempted to secure patents for the use of 3,4–DCPA as a herbicide. Monsanto has offered no reasonable excuse for its failure to assert a claim to 3,4–DCPA during the 6 years prior to public use and during the 6 years of public use and the Court upon examination of the entire record in this case can find none. Apparently, the reason Monsanto did not attempt to patent 3,4–DCPA in 1955 was because it did

---

15. See plaintiff's Proposed Findings of Fact and Conclusions of Law, pp. 8–10.

Huffman stated that he invented propanil in 1954. (Huffman, N.T. 56–57).

not think it was entitled to a patent due to prior art disclosures (see Huffman, N.T. 181). Instead, Monsanto acquiesced in the use of the chemical compound 3,4–DCPA by the public and in the marketing of it by its competitor, content that it would receive a patent on the use of 3,4–DCPA as a herbicide. Monsanto merely stood by with an invention it now claims to have made in 1955 while its competitor marketed the "invention" commencing in 1961. The policy of the patent law requires an inventor to patent his invention as soon as expeditiously possible and cannot countenance an unexcused delay of 12 years from the time the invention is allegedly made. Only in 1967 did Monsanto, seeking a new avenue of attack in this battle of corporate giants, decide to attempt to patent the compound itself.[16] Its move on this corporate chessboard has come too late. A 12 year delay in asserting a right to patent an invention is an unreasonable delay where the inventor acquiesces in public use and marketing of his invention for 6 of the 12 years and where there is no reasonable excuse for this delay. See Woofter v. Carlson, 367 F.2d 436, 442–443 (C.C.P.A. 1967) *citing* Judge Learned Hand in Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., 153 F.2d 516 (2d Cir. 1946); Jones v. Freed-Eisemann Radio Corp., 47 F.2d 174 (2d Cir. 1931); Veaux v. Southern Oregon Sales, Inc., 33 F.Supp. 605 (D.Ore.1940) and cases cited at page 607, footnote 3, *aff'd*, 123 F.2d 455 (9th Cir. 1941).

## IV. ANTICIPATION

Rohm and Haas further argues that the invention here patented was "described in printed publications" within the meaning of 35 U.S.C. §§ 102(a) and (b) and therefore was "anticipated". Under these sections if an invention was "described in a printed publication * *

before the invention thereof by the applicant for patent" (section 102(a)) or was "described in a printed publication * * more than one year prior to the date of the application for patent" (section 102 (a)), any patent on that invention is invalid. Since we have decided that Monsanto's 1967 patent application is entitled to the May 27, 1957 filing date, and since Dr. Huffman, if he invented 3,4–DCPA, did not invent it before May, 1955, the issue under sections 102(a) and (b) is whether this invention was described in printed publications sometime before May 27, 1956.

We have decided that the chemical compound 3,4–DCPA was described in printed publications before May 27, 1956 within the meaning of sections 102(a) and (b) and therefore was anticipated. It is clear that a *specific* description of a chemical compound or of its formula in the prior art is an anticipation of any claim to that compound even if the prior reference contains no method at all for its production. See Application of Baranauckas, 228 F.2d 413, 43 CCPA 727 (1955) and cases cited in that opinion at page 415. Rohm and Haas concedes in argument that neither 3,4–DCPA nor its structural formula was specifically described in prior printed publications. Rather, it argues that the disclosure of analogs, isomers, and homologs of 3,4–DCPA in the prior art constitutes an *implicit* description of 3,-4–DCPA and that such implicit description invalidates a compound patent. The prior art in this case does in fact implicitly describe propanil and its structural formula to one skilled in the art (Finding of Fact No. 41). In our opinion this implicit description of 3,4–DCPA by the prior art is sufficiently clear and distinct (Findings of Fact Nos. 43, 44 and 45) to invalidate Monsanto's patent. Our case is on all fours with the case of applica-

---

16. Monsanto did attempt in 1964 to claim the compound 3,4–DCPA in connection with an amendment to its 1961 application. The Patent Office denied Monsanto the opportunity to make additional claims. (See Finding of Fact No. 33). It should be noted, however, that it delayed three more years after this rejection until filing an application to patent 3,4–DCPA.

tion of Baranauckas, *supra*. The Court said in that case at page 416:

"We cannot see a logical distinction between this case, where the compound was revealed as clearly as if it had been explicitly named, and those cases in which it happened to be named explicitly. In this case it would not have changed the force or meaning of the reference in the slightest if it had specifically named each of the corresponding chlorine compounds. We can see no reason why we should hold an explicit naming of a compound to be an anticipation, and hold an equally clear, though implicit, disclosure not to be an anticipation.

At the same time, however, though our decision is compelled by the existing law, we feel constrained to point out that there are limits to the doctrine of those cases. What the precise boundary lines are, we are unable now to discern. Certainly they do not extend so far as to permit publication of theoretical lists of hundreds or thousands of possible compounds to deny patent protection on such compounds to those who actually discovered them later. The exact boundaries will have to be delineated on a case by case basis. But whatever they may be, we have not reached them here."

We are in full accord with the above-quoted language. To the same effect, see Application of Petering, 301 F.2d 676, 681–682, 49 CCPA 993 (1962); Application of Preda, 401 F.2d 825 (C.C.P.A. 1968).

## V. SPECIFICATION

Under 35 U.S.C. § 111, a patent applicant must include in his application a "specification" and in 35 U.S.C. § 112 the matters which must be included in such specification are spelled out. Rohm and Haas argues that Monsanto's patent is invalid because it has failed to comply with section 112.

We find this argument to be without merit. Rohm and Haas can point to nothing in Monsanto's patent application to support its contention. It attempts to support it by an argument more properly addressed to the issues of Constructive Abandonment and Laches, *supra*.

Upon our examination of the patent application (DX–1), Monsanto has met the requirements of section 112.

## VI. PRESUMPTION OF VALIDITY

 Monsanto has urged upon this Court throughout this litigation the rebuttable statutory presumption that a patent once issued is valid and that the burden of proving its invalidity is on the party asserting it. 35 U.S.C. § 282. We believe, however, that the presumption of validity has been destroyed in this case by Monsanto's intentionally withholding material facts from the patent office. The presumption of validity is based on the expertise of the patent office. Where the patent office does not have all material facts before it, the theory of the presumption is destroyed. The presumption falls with it. This is the rule applied in the case of intentional misrepresentations of material fact and the same should apply to intentionally withholding material facts. See Corning Glass Works v. Anchor Hocking Glass Corp., *supra*.

We might add that even if the presumption of validity had remained intact in this case, the result we reach would not be affected. Upon our examination of the record, we have concluded that Rohm and Haas has met its burden of proving invalidity by clear and convincing proof.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter and parties of this action.

2. The patent in suit, United States Letters Patent No. 3,382,280 issued May 7, 1968, entitled "3′ 4′–dichloro-propionanilide" is invalid and unenforceable for the following reasons:

(a) The chemical compound 3,4–DCPA was obvious within the meaning of 35 U.S.C. § 103;

(b) Monsanto intentionally withheld material facts in order to mislead the patent office, thereby making its application for a patent taken as a whole misleading;

(c) Even if the facts withheld from the patent office were not material, Monsanto has come into court with unclean hands;

(d) Although Monsanto did not constructively abandon its patent application, it was guilty of laches in asserting any right it had to patent 3,4–DCPA as a compound;

(e) The chemical compound 3,4–DCPA was "described in printed publications" within the meaning of 35 U.S.C. § 102 (a) and (b) and therefore was anticipated.

3. Accordingly, Rohm and Haas is not guilty of patent infringement and its counterclaim for a declaratory judgment of invalidity, unenforceability and non-infringement of the patent is granted.

4. Monsanto complied with 35 U.S.C. § 112.

5. The presumption of validity was destroyed by Monsanto's intentional withholding of material facts from the patent office.

6. Even if the presumption of validity were not destroyed, Rohm and Haas has met its burden of proving invalidity by clear and convincing proof.

## ORDER

And now, this 17th day of February 1970, it is ordered upon the foregoing Findings of Fact, Opinion and Conclusions of Law that judgment be and the same is hereby entered for defendant, Rohm and Haas Company, and against plaintiff, Monsanto Company, in Civil Action No. 68–1269.

## SUPPLEMENTAL OPINION

On February 17, 1970, we filed our Findings of Fact, Opinion, Conclusions of Law, and Order in the above-captioned case finding for the defendant and against the plaintiff in this patent infringement action, holding that plaintiff's patent was invalid. Plaintiff now moves under Rules 52 and 59 of the Federal Rules of Civil Procedure for an Amendment of our Findings, for the Addition of New Findings, and for a Partial New Trial.

Plaintiff's motion is directed at the following:

(1) Our Finding that the plaintiff was guilty of deliberately misleading the patent office in connection with the prosecution of its patent application. (Finding of Fact No. 37). With respect to this Finding, plaintiff requests the following relief: (a) either a new trial or (b) a modification of the Finding and the addition of New Findings numbered 50–56 in the appendix to plaintiff's motion.

(2) Our Findings with regard to some of the prior art in this case (Findings of Fact Nos. 43–45). With respect to these Findings, plaintiff requests a substitution of new Findings numbered 57–71 in the appendix to plaintiff's motion.

For the reasons set out below, plaintiff's motion is denied.

### (1) FINDING OF FACT NO. 37.

As noted above, in this Finding we found that Monsanto was guilty of deliberately misleading the patent office. Monsanto argues that it is entitled to a new trial on this issue because this was not the issue embodied in our Pre-Trial Order as an agreed-upon issue to be tried in this case. Rather, it is argued that the Court decided a different issue and that the plaintiff did not understand this to be the issue before the Court. Monsanto claims that it was thereby denied due process of law.

Plaintiff's argument must be rejected. The issue, as broadly framed in our Pre-Trial Order, reads as follows: "F. Did Monsanto misrepresent or withhold material facts during the prosecution of the patent in suit so as to render the patent invalid or unenforceable?" In our Opinion, at page 788, we stated the issue as follows: "(a) Did Monsanto

deliberately misrepresent or withhold material facts in order to mislead the patent office during the prosecution of the patent in suit so as to render the patent invalid or unenforceable?" It is clear to the Court that the issue decided is within the broader issue stated in the Pre-Trial Order. Moreover, it is also clear from the record that counsel for plaintiff was aware that the issue of fraud was before the Court. For example, in his opening statement plaintiff's counsel stated at page 26 of the Notes of Trial Testimony: "We also understand the defendant will attempt to prove that Monsanto, during the prosecution of its application, in some way misled the Patent Office into believing that the compound had unique and unexpected herbicidal properties and that it thereby rendered its patent unenforceable". And further: "So that the charge— and it is one which smacks of fraud and should not be made lightly * * * I think it will be perfectly clear before we are through here that there were no intentional misrepresentations * * "

Under these circumstances, plaintiff's motion for a new trial on this issue is denied.

Plaintiff's motion for a modification of Finding of Fact No. 37 is premised on the argument that Rohm & Haas has failed to meet its burden of proving that Monsanto made intentionally misleading omissions of material fact in the course of prosecuting its patent application. In conjunction with this motion to modify, Monsanto asks that we make additional findings. We have decided to deny this aspect of Monsanto's motion for the following reasons.

 As to whether Rohm & Haas has met its burden of proof, we have decided to let the record stand as it is. However, we are compelled to point out that even if we were persuaded to change our mind and find that although there were intentional omissions of fact, Monsanto did not intend to mislead the Patent Office, this would not lead us to a different conclusion with respect to the validity of a patent in light of such omissions. For the same policy considerations which underlie our February 17th Opinion (pages 792–794), we hold that even if Monsanto did not intend to deceive the Patent Office, the fact that it intentionally withheld facts which were material to the decision whether it was entitled to a patent is sufficient to bar the issuance of a patent to it. We found in our original Opinion that the facts withheld were material (see page 791). We believe that all questions of materiality in dealings with the Patent Office ought to be resolved in favor of disclosure. Only such a standard can protect the public from the deadening competitive effect of improvidently issued patents. In this case, a comparison of the herbicidal efficiency of 3,4–DCPA and other closely related compounds was clearly material to Monsanto's right to a patent. It is also clear that the decision not to disclose these facts to the Patent Office was a deliberate one (N.T. 791–792).[1] Under these circumstances, even if the decision not to disclose was motivated by nothing more than bad judgment as to the materiality of the information, the patent must still be rejected. We hold that a specific intent to deceive is not necessary to bar a patent when there is evidence of a deliberate withholding of material information. Of course, if it is found that the facts withheld were not even marginally material to the issues before the Patent Office, then our decision on this precise issue would be different.

 In addition, we specifically disapprove of any concept which permits patent applicants to "put their best foot forward" before the Patent Office (see Monsanto v. Dawson Chemical Co., 312 F.Supp. 452 filed April 17, 1970, Southern District of Texas). This kind of concept is only workable in adversary

---

1. See also the transcript of the oral argument before us on this motion at page 18 where plaintiff's counsel concedes that the failure to disclose was not accidental.

proceedings where the other side can be relied upon to bring out all of the facts adverse to the granting of the patent. In view of the realities of the patent office backlog, a standard of disclosure appropriate to adversary proceedings would defeat the public interest in not having patents improvidently issued.

### (2) FINDINGS 43–45

In our February 17th Findings of Fact, we concluded that the prior art in this case does not *specifically* recite the name 3,4–DCPA nor its formula, but that by virtue of the specific disclosure in the prior art of certain homologs, isomers and analogs of 3,4–DCPA that 3,4–DCPA and its formula was *implicitly* described to one skilled in the art. Plaintiff now asserts that certain portions of Findings 43–45 are (1) inconsistent with the above proposition and (2) completely in error in certain important respects, and moves that new findings, numbered 57–71 in the appendix to its motion, be substituted therefor. We have also decided to deny this aspect of plaintiff's motion.

Findings 43–45, with the particular excerpts challenged by this motion underlined, are as follows:

43. Biernert specifies that the acyl-amino group can be either acetylamino or propionylamino (DX–68, p. 1, col 2, lines 1–12). *The small number of so-described 3,4-dichlorobenzenes include 3,4–DCPA and 3,4–DCAA. The procedure taught in this patent to make the described pigments can start with either 3,4–DCAA as shown by FIAT* Final Report No. 1313, dated February 1, 1948 (DX–69), *or with 3,4–DCPA, the next higher homolog of 3,4–DCAA, to produce phthalocyanine pigments having "extremely close" properties* (Price, N.T. 522–33; Urry, N.T. 901–02). 3,4–DCPA was used by Dr. Price in the reaction disclosed by FIAT and a pigment was obtained having properties "very similar" to those of the pigment made from 3,4–DCAA. (Price, N.T. 534–39).

44. Chattaway, J. Chem.Soc.Trans. 81 (1902), pages 637–644, (DX–71), de-scribes the migration of a chlorine atom from the nitrogen to the para and then the ortho positions in propionanilide and chlorinated propionanilides, *including that derived from 3-chloroaniline wherein the meta position is already substituted by chlorine* (page 637). *The products obtainable by Chattaway's method constitute a small group of ten chloro-propionanilides, one of which is 3,4–DCPA obtained from 3–chloroaniline.* (Price, N.T. 548–49, 552). The reaction that Chattaway gives is very similar to the one that can be applied to the production of propanil. (Urry, N.T. 904–05).

45. Fontein, Recueil Des Travaus Chimiques Des Pays Bas 47 (1928), pages 635–667, (DX–70), describes the reaction velocity measurement of intra-molecular changes in a group of compounds having the formula:

[A2026]

wherein X is chlorine or bromine, A is formyl, acetyl, propionyl, butyrl or benz-oyl, and R is hydrogen, chloro, bromo or methyl (page 638). The changes under study are migration of X from the nitro-gen atom (N) to the 4-or para-position on the phenyl nucleus thereby producing compounds having the formula:

[A2025]

wherein X, R and A are defined as above (pages 644, 654, 657, 663). *Fontein*

*indicated a preference for compounds of this second formula wherein X is chlorine and included specific reference to the production of 3,4–DCAA (page 663.) (Price, N.T. 560; Urry, N.T. 905). Using propionyl in lieu of acetyl, 3,4–DCPA will be obtained (Price, N.T. 566–61; Urry, N.T. 906–07).*

We do not believe that the challenged findings are inconsistent with the proposition that 3,4–DCPA was implicitly but not specifically disclosed in the prior art. These findings include statements of (1) what the prior art says specifically and (2) what the prior art says implicitly to one skilled in the art. The challenged excerpts are, for the most part, findings as to what one skilled in the art would be taught by the prior art, as testified to by defendant's experts, and should not be misconstrued to be statements of what the prior art specifically says. This should be very clear when the Findings are read in conjunction with the record citations.

Lastly, we do not think that the challenged excerpts are in error. We have again reviewed the record with respect to these Findings and find that the record supports them.

Thus, except to the extent that we amended these Findings at the oral argument on this motion, we will let our findings stand as they are.[2] Accordingly, plaintiff's motion for substitution of new findings, numbered 57–71 in the appendix, is denied.

(3) FINDING OF FACT NO. 49

At the oral argument on the post-trial motion in this case, counsel for defendant suggested that since the Court had expressed a desire to avoid prejudging any issues still pending before the Patent Office we amend Finding of Fact No. 49 because it may have such an effect. Counsel for the plaintiff argues it will not have a prejudging effect and, in any event, defendant's request is an un-

timely attempt to seek an amendment of our Findings.

Quite apart from whether this Finding prejudges issues pending before the Patent Office, we have decided, on our own accord, to amend Finding of Fact No. 49. The amendment is necessary because upon reexamination of the record, we find that the Patent Office has cited one prior art reference before us as teaching that some compounds related to 3,4–DCPA have phytotoxic properties (see DX–3, p. 45 citing the CBCC publication, DX–74). In light of this, we prefer to limit our Finding to the selective, post-emergence herbicidal use of 3,4–DCAA and 3,4–DCPA. Accordingly, Finding of Fact No. 49 will be amended as follows:

"49. The use of 3,4–DCAA and 3,4–DCPA as selective post-emergent herbicides was not revealed or in any way suggested in the prior art before May 27, 1956."

### ORDER

And now, this 21st day of May, 1970, it is ordered that plaintiff's motion under Federal Rules of Civil Procedure 52 and 59 be and the same is hereby denied.

---

2. At the oral argument, we amended the second sentence of Finding of Fact No. 43 as follows:
"The small numbered so-described 3,4–dichlorobenzenes *would, to a chemist*

*skilled in the art,* include 3,4–DCPA and 3,4–DCAA *although the specific formulae were not recited by Bienert.*