UNITED STATES of America, Plaintiff,

v.

CIBA–GEIGY CORPORATION, Defendant.

Civ. A. No. 791–69.

United States District Court, D. New Jersey.

Aug. 7, 1979.

As Corrected Nov. 7, 1979.

Final Judgment Feb. 11, 1981.

See also, D.C., 508 F.Supp. 1118.

Robert J. Del Tufo, U. S. Atty., Newark, N. J. by P. Terry Lubeck, Joseph T. Melillo, Nicholas W. Clark, Asst. U. S. Attys., Intellectual Property Section, Antitrust Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Kenyon & Kenyon, Reilly, Carr & Chapin by Hugh A. Chapin, Paul H. Heller, Arthur D. Gray, James Galbraith, New York City, and Lowenstein, Sandler, Brochin, Kohl & Fisher by Murray J. Laulicht, Newark, N. J., for defendant.

## OPINION

MEANOR, District Judge.

This is an action instituted on July 9, 1969 by the United States under section 4 of the Sherman Act, 15 U.S.C. § 4, for injunctive and other appropriate relief to remedy and prevent alleged violations of section 1 of the Act, 15 U.S.C. § 1.

The defendant, Ciba-Geigy, is a New York corporation with its principal offices in Ardsley, N.Y., and the principal offices of its pharmaceutical subsidiary in Summit, N.J.. Defendant was formed in 1970 through the acquisition of CIBA, a Delaware corporation, by Geigy Pharmaceuticals, a New York corporation, following which the name was changed to Ciba-Geigy Corporation.

Pursuant to an order of this court, the trial of this action was bifurcated, the issues of patent validity being separated from the issues of antitrust violation. The antitrust issues were tried to the court from April 29, 1975 to May 22, 1975. I rendered a written opinion on April 15, 1976, reported in 1976–1 Trade Cas. ¶ 60,908. It is important to read that opinion prior to the reading of this opinion for a thorough understanding of the issues.[1]

The government alleges that it has standing to challenge the validity of Ciba's U.S. Patent No. 3,163,645 ("645 Patent") which covers hydrochlorothiazide ("HCT") and many derivatives of HCT.[2] The government, however, is only challenging product claims 1, 2, and 3, and process claims 40 and 41 of the '645 Patent. Of these product

1. The antitrust opinion should be consulted for definitions of general and technical terms not otherwise defined herein; a description of and full names of the various drug companies mentioned; and the factual background knowledge of which is necessary to place the patent issues in proper focus.

2. The government also alleged standing to challenge U.S. Patents Nos. 3,499,082, 3,379,612, 3,515,786. These patents cover the combination of HCT or derivatives thereof with one or more other therapeutically active ingredients. In an order dated December 13, 1976, this court ruled that the government did not have the requisite standing to challenge the validity of the combination patents on the ground that the government had not established a sufficient nexus between the patent and the antitrust violations as required by the *Gypsum-Glaxo* decisions, *infra*. Thus, the trial of the patent issues was limited to the issue of validity of the '645 Patent.

The government clearly does not have standing to challenge the combination patents under *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). The Supreme Court in *Gypsum* held that the government had standing to attack the validity of a patent in an antitrust case since the de-

claims, claim 3 specifically covers HCT, claim 2 is a subgeneric claim covering HCT and three other derivatives, and claim 1 is a generic claim covering HCT and many of its analogs. Ciba contends that the government only has standing to show that product claim 3 is invalid.

## HISTORICAL SETTING

Prior to 1957, Merck, Ciba, and other pharmaceutical companies were engaged in extensive research work to develop an effective oral diuretic. At that time, the most prevalent treatment for edema or hypertension was the injection of organic salts of mercury. Understandably, this was not an acceptable form of treatment for people suffering from long-term asymptomatic hypertension. Patients would not submit to the frequent injection of these salts to treat a disease that caused them no present discomfort. Merck was the first to succeed in

---

fendant "relied" on the patent in an attempt to justify the resale restriction it imposed on its licensees. Here, Ciba did not rely on the combination patents as a defense to the government's antitrust charges.

It is also the government's position that it has standing to challenge the combination patents under *United States v. Glaxo Group, Ltd.*, 410 U.S. 52, 93 S.Ct. 861, 35 L.Ed.2d 104 (1973). In *Glaxo*, defendants Imperial Chemical Industries Ltd. ("ICI") and Glaxo Ltd. were engaged in the manufacture and sale of griseofulvin, an antibiotic compound. Griseofulvin itself was unpatented and unpatentable. ICI owned various patents on the dosage-form of the drug. Glaxo owned various patents on a method of manufacturing the drug in bulk-form as well as a patent on the microsize dosage-form.

The two drug companies entered into an agreement pooling their process and dosage-form patents. The pooling agreement contained a covenant to restrict bulk sales of their material. In addition, they sub-licensed certain American firms to utilize their patents. The sub-licensing agreements prohibited bulk sales of the materials to third parties without the prior consent of ICI and Glaxo.

The government charged that the restrictions were unreasonable restraints of trade. The government also challenged the validity of ICI's dosage-form patent. The District Court held the agreements were violative of 15 U.S.C. § 1, but declined to order mandatory licenses and sales on terms sought by the government. The District Court also denied the government standing to attack the validity of the patent on the grounds the defendants did not "rely" on the patent as a defense to the antitrust suit.

On appeal, the Supreme Court reversed the District Court decision with respect to the government's standing to challenge the validity of the patent and a request for further relief by means of mandating licensing. The Supreme Court held that where a patent is the economic leverage of the antitrust violations and the government has established a substantial case for further relief, the government may challenge the validity of the patents regardless of whether the owner relies on the patents in defending the antitrust action.

*Glaxo* does not mandate standing in the present case. The combination patents were not the economic leverage with which Ciba insisted upon and enforced the bulk-sales restrictions imposed upon the licenses for the simple reason that the combination patents did not come into existence until years after the HCT sales agreements.

Secondly, the government has not established a substantial case for further relief in the form of mandatory licensing as set forth in this court's antitrust opinion. 1976–1 Trade Cas. ¶ 60,908 at 68,967.

The Supreme Court in *Glaxo* specifically circumscribed its holding, stating:

we do not recognize unlimited authority in the government to attack a patent by basing an antitrust claim on the simple assertion that the patent is invalid. *Cf. Walker Process Equipment v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). Nor do we invest the Attorney General with a roving commission to question the validity of any patent lurking in the background of an antitrust case.

410 U.S. at 59, 93 S.Ct. at 866.

Indeed, *the circumstances of the instant case* fall within the Supreme Court's admonition in *Glaxo* in that Ciba's combination patents, even if found invalid, would not change in any fashion this court's ruling on the antitrust issues.

As the antitrust opinion demonstrates, Ciba did not rely upon its combination patents to justify a sales or licensing agreement that without patent protection would have been in violation of the Sherman Act. It relied upon the existence of the combination patents to show the minimal market effect that its invalid sales restrictions had, in fact, occasioned. Even if the vending restraints had not existed, no other manufacturer could have produced the combination products without infringing the patents on them. The use Ciba made of the existence of the combination patents in the antitrust case was the same use that would have obtained if those patents had been owned by another. In other words, Ciba did not use the combination patents to avoid liability under the Sherman Act, but used them only to minimize the market effect of the violations found to exist.

discovering such an oral diuretic when, in 1956, it isolated and later patented chlorothiazide (CT). Merck marketed this drug in 1957 under the trade name "Diuril" after obtaining the necessary FDA approval.

The discovery of CT was a major medical breakthrough. It constituted one of the most significant discoveries of this century in the treatment of hypertension and edema. CT was discovered by a scientist at Merck named Fredrick C. Novello, when he reacted 5-chloro-2, 4-disulfamyl aniline (Novello aniline), known to him to have some diuretic properties, with formic acid. (GX 1212; Tr. 1020–21) The resultant product, CT, is described by the following chemical name, 6-chloro-7-sulfamyl-2-H-(1,2,4)-benzothiadiazine-1, 1 dioxide. (GX 1219).[3]

Novello's discovery of CT was made public in late 1957 via the issuance of Merck's patent covering CT, U.S. Patent No. 2,809,-194 (GX 1212) as well as by various speeches and articles (GX 1217, 1218)

presented by Dr. Novello and his colleague at Merck, Dr. James Sprague (Tr. 906–11). Following the announcement of CT in 1957, many pharmaceutical companies, including Ciba, undertook to make a product which would be more potent than CT, a pursuit in which Merck had been engaged for over a year (Tr. 1575–76). Between January and March 1958, Drs. George DeStevens and Lincoln Harvey Werner of Ciba discovered hydrochlorothiazide, a product which was 10 times as potent as CT. HCT is the primary focus of the patent aspect of this litigation.

## COMPARISON OF THE CHEMICAL STRUCTURES OF HCT AND CT.

HCT is described by the chemical name 6-chloro-7-sulfamyl-3, 4-dihydro-2-H-(1,2,4)-benzothiadiazine-1, 1-dioxide (GX 1220). HCT is neither a homologue nor an isomer of CT (Tr. 132). A comparison of the structures of CT and HCT reveals that HCT has

3.

Chlorothiazide, as pictured above, is what is known as a bicyclic ring system. The ring on the left is known as the benzene ring and the ring on the right is known as the heterocyclic ring. The various positions in this ring system are numbered conventionally from 1 through 8 as shown, the two points where the rings join, again by convention, not being numbered. At each of the points of the ring there is an atom present. By convention, when all the atoms in a ring are carbon, they are not depicted but are assumed to be present. Thus, on the left-hand benzene ring, at each of the six points of the ring there is a carbon atom present which could be depicted by placing a C at each point within the ring. On the other hand, in the right-hand heterocyclic ring, at certain positions there are atoms other than carbon within the ring. Thus, at the 1 position there is a sulphur atom depicted as S, at the 2 position a nitrogen atom depicted as N, at the 3 position a carbon atom depicted as C, and at the 4 position a nitrogen atom depicted as N. Each of the atoms within the ring has a certain number of electrons associated with it. When atoms

are joined together in such a way that they share two electrons they are said to form a single bond illustrated by a single line. When atoms are joined together in such a way that they share four electrons they are said to form a double bond and such a bond is depicted by a double line. Thus, in the above drawing, in the left-hand benzene ring, double bonds are depicted by the double lines between positions 5 and 6, between positions 7 and 8 and between the two unnumbered positions, while in the right-hand heterocyclic ring there is a double bond only between positions 3 and 4. (Tr. 899–904)

The various atoms within the rings are also capable of having one or more other atoms attached to them. It is the combination of the interaction and relationship of the various atoms within the ring with each other and with the atoms attached to them which is ultimately responsible for the characteristics of the molecule. Thus, in the chlorothiazide molecule depicted above, the carbon atom at the 6 position has a chlorine atom, depicted as Cl, attached to it; the carbon atom at the 7 position has a group of atoms known as a·sulfamyl group, depicted as $NH_2SO_2$, attached to it; the carbon atom at the 3 position has a hydrogen atom, depicted as H, attached to it; and so on. Often, by convention, the presence of hydrogen atoms is not depicted since it is known that they are present in an amount to satisfy the requirement that each carbon atom has four bonds. Thus, the hydrogen atom present at positions 5 and 8 is not shown. (Tr. 899–904)

a single bond rather than a double bond between the 3 and 4 positions in the heterocyclic ring (GX 1220).[4] Whenever a double bond in a compound is eliminated, that bond is deemed to have been saturated. Thus, HCT is the saturated derivative of CT, and, conversely, CT is the unsaturated derivative of HCT.

In the case of HCT, this saturation or elimination of the double bond is caused by the addition of two hydrogen atoms to the molecule (Tr. 1037). Thus, two of the electrons forming the double bond at the 3–4 position are not shared between carbon atoms but instead operate to bond two additional hydrogens to the molecule. It is the addition of the two hydrogens which give HCT its name, i. e., dihydrochlorothiazide, which is commonly shortened to hydrochlorothiazide. The process of adding these two hydrogens to the molecule is referred to as saturation, hydrogenation or reduction.

While saturation might appear to be an insignificant structural change when the two compounds are compared two-dimensionally, saturation is the type of change that can have a substantial effect on a molecule since it alters such things as the shape and basicity of the molecule (Tr. 1311–12).

The government concedes that HCT is new and useful. It contends, however, that HCT is not in compliance with 35 U.S.C. § 103,[5] the statutory requirement of non-obviousness, on the ground that HCT is structurally obvious in view of the Novello Patent on CT and the Freeman-Wagner article.[5a]

The Novello Patent discloses the compound CT and its utility as an orally effective diuretic. It also discloses how to make the compound by reacting the starting material, Novello aniline, with an excess of formic acid. The Novello Patent also discloses and claims thousands of derivatives of CT (Tr. 541). Of these thousands of derivatives, all possess the double bond in the 3–4 position and none discloses or suggests the saturation of this double bond.

The Freeman-Wagner article discloses that if one takes a sulfamyl aniline and reacts it with a reactive derivative of formic acid, the resultant product can be a thiazide. The Freeman-Wagner article also discloses that if one takes a sulfamyl aniline and reacts it with formaldehyde, one can get a dihydrothiazide. The Freeman-Wagner article specifically teaches one to use an excess of formaldehyde. However, in order successfully to make HCT by the formaldehyde method, one must take the Novello aniline and react it with stoichiometric or

**4.**

"CT"          "HCT"

---

**5.** The statute provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

**5a.** J. H. Freeman and E. C. Wagner, 16 J.Org. Chem. 815 (1951).

equimolar amounts of formaldehyde. If an excess of formaldehyde is used, as the Freeman-Wagner article teaches, one will fail to obtain HCT.

Novello was probably the most skilled in the relevant art at the time, and his colleagues at Merck were extensively involved in a pursuit to find an improved analog of CT. While Novello envisioned HCT as a potential solution, it was not accorded a high priority (Tr. 1577–79). When he finally did try to make HCT, he used an excess of formaldehyde as called for in the Freeman-Wagner article and failed. Between March 14, 1956 and September 1958, Novello tried to make HCT on four separate occasions. Each time he used an excess of formaldehyde and each time he failed. In August 1958, Merck found out from a clinician that Ciba had a new product on the market which was 10 times more potent than CT (Tr. 1576–77). Merck was told the product was HCT. It is only then that Novello prepared HCT (Tr. 1587–89). This is noteworthy circumstantial evidence that HCT was not an obvious solution to Merck's quest for an improved analog of CT.

On the other hand, four other parties prepared HCT by reacting the Novello aniline and formaldehyde around the same time Ciba invented HCT. Each of these parties, including Merck, filed patent applications in the Patent Office claiming HCT. The Patent Office declared interference No. 90,020 to determine which of these parties was the first to discover HCT. The other parties were Abbott Laboratories, Schering Corporation, Lovens Kemiski, a Danish company, and Chinoin, a Hungarian company. Notwithstanding the circumstantial evidence suggesting obviousness, there was nothing in the relevant prior art indicating that saturation of CT would improve it. The government's expert, Dr. Burns, and Ciba's expert, Dr. Taylor, both testified that the results of saturation are totally unpredictable (Tr. 1287–98; DX 395, 400–01).

## COMPARISON OF PROPERTIES OF HCT AND CT.

As mentioned previously, CT was an important medical breakthrough. It is the first potent, orally effective diuretic agent that is continuously effective in the treatment of all kinds of edema. CT is also effective in the treatment of hypertension, and it potentiates other antihypertensive agents. CT is also an extremely safe drug, even for long-term administration, and incidences of toxic reactions to CT are very rare. (Tr. 161–63; GX 1288 at 32). The major side effects of CT are hypokalemia (potassium loss), hyperuricemia (elevation of blood uric acid and urea), and hyperglycemia (elevation of blood sugar) (Tr. 164–69).

HCT, like CT, is also a very useful diuretic and antihypertensive agent. This is true, not because of any differences between the two drugs, but rather because the drugs are similar in so many important ways (Tr. 170–71, 184, 202–04, 248, 1618; GX 1288 at 45–46, GX 1265 at 117, GX 1758 at 1210–12, 1236–38). Since HCT was introduced, the package inserts for CT and HCT have been substantially identical, listing the same actions, indications, contraindications, warnings, cautions, and adverse reactions for the two drugs. (Physicians Desk Reference, 32d ed. 1978)

At equally potent doses, there is no significant difference between the natriuretic effects of CT and those of HCT. (Tr. 35–36, 179). The same is true with regard to the diuretic and saluretic effects of the two drugs (Tr. 184–86, 1236–37; GX 1758). At equally potent doses, there is also no significant difference between CT and HCT as antihypertensive agents (Tr. 26–34, 191, 1711). And no significant difference exists between CT and HCT in their ability to potentiate other antihypertensive agents (Tr. 36, 191). CT and HCT are both extremely safe drugs, and there is no significant difference between the safety of the two drugs in humans (Tr. 39–40, 191–92). The same applies with regard to the side effects they produce (Tr. 38–40, 201; GX 1758 at 1200, 1238). In particular, the potassium components of their electrolyte excretion patterns are the same, and there is no difference between them with regard to

their tendency to cause hypokalemia (Tr. 1758). CT and HCT both have the same mechanism of action. They inhibit the reabsorption of sodium and chloride in the renal tubules. (GX 1268, GX 1288 at 32). Unlike the earlier mercurial and carbonic anhydrase inhibitor diuretics, CT is effective in the presence of either metabolic acidosis or alkalosis (Tr. 158). CT and HCT each have the same duration of action, approximately 6 to 12 hours (GX 1271, GX 1288 at 46, GX 1798 at 0190, 0193).

The most significant difference between the two drugs is that HCT is about 10 times more potent than CT (Tr. 172–73).[6] The two drugs have a common ceiling on their diuretic and natriuretic dose effect curves. This common ceiling means that at equally potent doses of the two drugs, CT and HCT have the same effectiveness as diuretics and antihypertensive agents. The greater potency of HCT means only that it can be administered to a patient in a smaller tablet than CT.[7] The advantage of a smaller tablet is patient convenience. This is meaningful in hypertension therapy where the disease is asymptomatic and the patient is usually required to take medication daily for his entire life (Tr. 1363, 1436–39, 1661, 1772–73).

An additional advantage of increased potency is that when HCT is combined with other therapeutic agents the problem of pill size and quantity of drug is reduced[8] (Tr. 1198–99, 1419–21, 1607–08). HCT outsells CT three to one and this does not include sales of HCT and CT combination drugs (Tr. 1505–17).

## ISSUE OF FRAUD ON THE PATENT OFFICE.

The Patent Office initially rejected all of Ciba's claims covering HCT on the ground that the structure was obvious in view of the combination of the Novello Patent and the Freeman-Wagner article. Ciba responded by submitting an amendment to the Patent Office wherein Ciba disagreed with the examiner's rejection. In addition, Ciba submitted the affidavit of Dr. Plummer, establishing that HCT was eight times more potent than CT (GX 1210 at 61–64). Subsequently, Ciba submitted two more affidavits. The first was an affidavit by Ciba's toxicologist, Dr. Earl, showing that in Ciba's test with rats HCT had been found to be half as toxic as CT on an acute LD50 basis (GX 1210 at 67–69). The second affidavit was submitted by an outside clinician, Dr. Likoff, which indicated that certain patients whom he treated responded to HCT after they became refractory to CT or a combination of CT and mercurials (GX 1210 at 70–73).

Thereafter, on December 18, 1958 the examiner withdrew his rejection of the claims.

## POTENCY AFFIDAVIT.

The data for the potency affidavit was generated by experiments conducted under the supervision of the affiant, Dr. Plummer.

---

**6.** Another difference is that HCT has a different electrolyte excretion pattern than does CT (Tr. 1374–75). HCT causes excretion of more chloride ion than does CT. The excretion of more chloride ion can be important in patients with severe renal disease who are prone to acidosis. HCT will be less likely to promote this acidosis and thus will be more beneficial than CT to such a patient (Tr. 1724–42, 1751). Ciba did not rely on this difference when applying for its patent on HCT.

**7.** CT is sold in pill sizes of 250 and 500 mg.; the usual dosage is 500 to 2,000 mg./day. HCT is sold in pill sizes of 25, 50, and 100 mg.; dosage being 50 to 200 mg./day.

**8.** Another advantage of HCT is its use as alternate therapy. There was testimony supporting the finding that some patients were refractory to CT but responded to HCT and vice versa (Tr. 1662–64, 1670–72, 1701–05, 1835–40; DX 326–31; GX 1210 pp. 70–73). In 1958, this made HCT a valuable product because CT was the only available effective oral diuretic. If a patient did not respond or had adverse reaction to CT, there was no satisfactory oral alternative. HCT filled this need (Tr. 1672–74, 1710–12). As time went on, this factor became insignificant since other effective oral diuretics were developed (Tr. 1670, 1705).

Also, in early 1958 increased potency was considered valuable because it was believed that to put less foreign substance into the body over a long period of time was preferable. Presently, this theory is not controlling.

The presentation was made by determining the threshold dose, *i. e.*, the minimum dose at which a response greater than the control was realized for the more potent compound HCT. For HCT, that dose was 0.02 mg./kg. The other compound, in this case CT, was then tested at that dose but showed no response. The dose of CT was then continually doubled until it showed a response above the control which would establish its threshold dose, in this case 0.16 mg./kg. The dosage of each drug was then doubled once more just to make sure that the response did indeed stay above the control to verify that a true threshold dose had been reached. By comparing the threshold doses of the two drugs, one arrived at their relative potencies, in this case 0.16:0.02 or 8:1, the result reported in Dr. Plummer's affidavit.

Ciba omitted the fact that CT and HCT had the same efficacy—that is, that if each is administered in its maximal effective dosage, each would have the same effect. The government's fraud argument turns on the assumption that the patent examiner was laboring under the misconception that higher potency implies higher efficacy. Experts from both sides, however, testified that potency and efficacy are independent characteristics of drugs and knowledge of one does not imply anything about the other.

## TOXICITY AFFIDAVIT.

The toxicity affidavit was executed by the then head of Ciba's toxicology department, Dr. Alfred E. Earl. Dr. Earl ran an LD50 acute toxicity study on rats and concluded on the basis of that study that HCT was approximately half as toxic as CT on an acute basis. The study which Dr. Earl conducted was a very rough study. He did not use a large animal population and he had trouble getting both CT and HCT into solution so he was forced to use a solvent which itself contributed to the toxicity of the solution. The data which Dr. Earl presented in his affidavit was a rough estimate of the acute toxicity of the two compounds. The alleged shortcomings in the

data relied upon by the government were contained in the affidavit and were apparent on the face of the affidavit (Tr. 384). At the time the Earl affidavit was submitted, the data in the affidavit was the only comparative acute toxicity data which Ciba possessed. Neither Dr. Earl nor anyone else at Ciba had any reason to question the accuracy of the data (Earl Dep. of January 26, 1977 at 58–59) aside from the above mentioned difficulties which had been encountered in running the experiment. Such difficulties were presented in the affidavit itself. At the time of Ciba's submission of the toxicity affidavit, CT had already been marketed for a considerable time and was known to be a very non-toxic product. Four months after the submission of Dr. Earl's affidavit to the Patent Office, certain persons within Ciba, including Dr. Earl, but not including Ciba's patent department, became aware that Merck had conducted acute toxicity comparisons between CT and HCT and concluded that CT was half as toxic as HCT. Merck used more animals and did not use a toxic solvent. Merck's experiments were subject to other deficiencies which made its data just as suspect as the government alleges Dr. Earl's data to be (Tr. 373–74). For example, Merck's data had been composed of separate studies run over two years apart (Tr. 375–76, 385–86), whereas Dr. Earl's data had been gathered from experiments run at roughly the same time. (Earl Dep., supra, at 32–33.)

Regardless which study is more accurate, both studies confirm that on an acute toxicity basis, both drugs were of low toxicity and very safe.

## THE RICHTERICH ARTICLE.

On December 1, 1958, Ciba received a draft of a publication about to be published in Switzerland by a Dr. Richterich, an independent clinician who had been studying HCT in Europe. At the conclusion of this article, Dr. Richterich stated:

From a physiological viewpoint it is interesting that the maximal response obtained with any dose of chlorothiazide and hydrochlorothiazide is quantitatively and

qualitatively (electrolyte pattern in acute experiments in humans) identical though hydrochlorothiazide is about 20 times as active as chlorothiazide. This probably means that both drugs inhibit sodium re-absorption at the same site and by the same mechanism of action. Enzymatic conversion of chlorothiazide to hydrochlorothiazide in vivo, similar to the hydration of some steroid hormones might explain the discrepancy in diuretic effectiveness.

(GX 1465)

Two days after learning of this proposed publication, Mr. Goldsmith, head of Ciba's patent department, sent a cable to the parent company in Switzerland asking if publication could be stopped. (GX 1466). The next day, he followed his cable with a letter (GX 1469) explaining his reasons for wanting to stop the publication in the following language:

> We urged deletion of the last sentence because of the possibility that the Examiner could utilize it as an anticipation of our invention, on the theory that if chlorothiazide was converted into hydrochlorothiazide in the body, then hydrochlorothiazide existed before our invention thereof. Dr. Schlittler has informed us that in tests here with animals given chlorothiazide there is no evidence of such a conversion by the body, since no hydrochlorothiazide was found in the urine.

The parent company replied that the publication had already gone to press and could not be stopped, and the Richterich article was published on December 15, 1958.

Richterich's hypothesis was based on his erroneous observation that the electrolyte excretion patterns of CT and HCT were identical (GX 1465). At the time that Ciba received the Richterich article, it was known within Ciba that the electrolyte patterns of CT and HCT were not the same (Tr. 1379–84). Further, Ciba had already done certain work concerning the metabolites of CT and had no evidence other than that CT passed through the body unchanged. (Kolodny Dep. of February 27, 1972, Vol. III, at 50–51) The Richterich

article itself indicated that it was only reporting preliminary findings and that a more complete presentation of his work would be forthcoming shortly (GX 1471). On January 15, 1959, Dr. Schlittler, Ciba's director of research, who had been sent the first Richterich article, received a draft of Richterich's complete findings in the form of a second draft article (DX 347). That second article was published in April 1959 (DX 344, 345). In the second article, Richterich recognized that the electrolyte excretion patterns of CT and HCT were different and that, therefore, the basis for his hypothesis had been in error. He then withdrew his hypothesis by labeling it as being "improbable." (DX 345 at 24) The government contends that Ciba is guilty of fraud for not informing the Patent Office about Richterich's hypothesis.

## DISCUSSION

The government originally brought this action for relief under the antitrust laws charging Ciba with violation of section 1 of the Sherman Act, 15 U.S.C. § 1. One of the alleged violations related to an agreement between Ciba and Abbott Laboratories pursuant to which Ciba licensed Abbott under Ciba's U.S. Patent '645 to manufacture and use HCT, and sell it "in specialty form." The government contended that the agreement improperly excluded bulk sales of HCT by Abbott, and was illegal under section 1 of the Sherman Act. After the trial on the antitrust issues, this court held that the agreement was not illegal because of Ciba's patent monopoly on HCT.

The government is now attacking the validity of the '645 Patent.

### A. STANDING

■ The government is attacking claims 1, 2, 3, 40, and 41 of the '645 Patent. On the non-fraud grounds, the government has standing to attack only claim 3. Claim 3, which covers the product HCT, is sufficiently related to the antitrust violation as required by the Supreme Court in *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)

and *United States v. Glaxo, Ltd.*, 410 U.S. 52, 93 S.Ct. 861, 35 L.Ed.2d 104 (1973). (*See* note 2, *supra*, for a full discussion of these cases.)

Claims 1 and 2 cover derivatives of HCT, and claims 40 and 41 cover a process for making HCT. These claims have nothing to do with the antitrust violation. The government's standing must be limited to those claims where there is established a sufficient nexus between the patent claims and antitrust violations. Otherwise, we fall within the Supreme Court's admonition in *Glaxo, supra*, that "we [do not] invest the attorney general with a roving commission to question the validity of any patent lurking in the background of an antitrust case." *Id.* 410 U.S. at 59, 93 S.Ct. at 866.

On fraud grounds, however, this court recognizes the government's right to attack the entire patent. *See Walker Process Equipment, Inc. v. Food Machine and Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

## B. PATENT VALIDITY

■ The government concedes that HCT is new and useful. Only the third statutory criteria, 35 U.S.C. § 103, that the subject of a patent not be obvious, is in dispute.[9] The Supreme Court in the landmark case, *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), set forth the law relating to obviousness under 35 U.S.C. § 103 as follows:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

*Id.* at 17, 86 S.Ct. at 693.

There are conflicting views as to the factors that may be considered when analyzing a challenge to a chemical compound on obviousness grounds. One view asserts that structural obviousness of the claimed compound from the prior art reference is an absolute bar to a patent. A difference in chemical properties becomes irrelevant in determining obviousness and is only applicable in determining utility under 35 U.S.C. § 101. *Carter-Wallace, Inc. v. Davis Edwards Pharmacal Corp.*, 341 F.Supp. 1303 (E.D.N.Y.), *aff'd on other grounds*, 443 F.2d 867 (3d Cir. 1971), *cert. denied*, 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973).

The other view rejects this contention and holds that a new and unexpected property may impart unobviousness to an otherwise structurally obvious compound. *In Re Papesch*, 315 F.2d 381 (C.C.P.A.1963); *Comm'r of Patents v. Deutsche Gold-und-Silber*, 397 F.2d 656 (D.C.Cir.1968); *In Re May*, 574 F.2d 1082 (C.C.P.A.1978); *Eli Lilly Co. v. Premo Pharmaceutical Lab., Inc.*, No. 78–2589 (D.N.J. July 13, 1979).

■ Title 35 U.S.C. § 103 provides that an invention is obvious and unpatentable only if "the subject matter as a whole would have been obvious at the time the invention was made" to one skilled in the art. It is reasonable statutory interpretation to include the properties of a chemical invention when determining whether the compound *as a whole* is obvious. *Application of Magerlein*, 602 F.2d 366 (C.C.P.A. 1979).

## STRUCTURAL OBVIOUSNESS

The government contends that HCT is structurally obvious in view of the combination of the two prior art references: the Novello Patent on CT and the Freeman-Wagner Article. HCT is the dihydro (or saturated) analog of CT. The chemical structure of CT and HCT differ only in that CT has a double bond between the nitrogen atom in the 4 position and the carbon atom in the 3 position, whereas HCT has a single bond between the same nitrogen and carbon atoms. Two hydrogen atoms, one attached to the nitrogen atom and the other attached to the carbon atom have replaced the other bond of CT. This conversion is sometimes referred to as hydrogenation. The prior art

---

**9.** *See* note 5, *supra*.

reference, the Freeman-Wagner article, arguably, provides the knowledge to carry out this conversion.[10]

The two compounds, HCT and CT, are structurally similar.[11] But, this similarity is not dispositive of the issue of structural obviousness. Before there can be a finding of structural obviousness, it is necessary to demonstrate a motivation to prepare HCT and an ability to predict its properties. There has to be more justification for labeling compounds structurally obvious other than that they appear similar on paper. In *In re Stemniski*, 444 F.2d 581 (C.C.P.A. 1971), the U.S. Court of Customs and Patent Appeals stated:

> what on this record—other than abstract, theoretical or academic considerations— would lead one of ordinary skill to change the structure of the reference compounds to obtain the claimed compounds? Certainly no practical considerations which promote the progress of useful arts or are of use to society are manifest. How can there be obviousness of structure, or particularly of the subject matter as a whole, when no apparent purpose or result is to be achieved, no reason or motivation to be satisfied, upon modifying the reference compounds' structure?

*Id.* at 586.

Hydrogenation, while not routine in diuretic pharmacology, was not a unique modification of a compound, and would likely occur as one of many possible modifications to a chemist of ordinary skill in the art at that time. Although a chemist would not have been certain that HCT would possess diuretic properties, the chemist would have expected that there was a high probability that HCT would retain the diuretic activity of CT, and there was a reasonable probability that the diuretic activity of HCT would be comparable to that of CT. However, there was no teaching in the prior art that

hydrogenation should be applied to diuretics to *improve* their properties. It is not enough that Ciba might have chosen to prepare HCT on the basis that there was some semblance of a chance of success. If this were the standard for obviousness, then the only experiments that would be encouraged by the patent system would be those undertaken blindly and haphazardly, and contrary to what the scientific community refers to as research. *In re Tomlinson*, 363 F.2d 928, 931 (C.C.P.A.1966). The question to ask, with respect to whether HCT was obvious, is not whether a chemist could have prepared HCT if specifically asked to do so, nor whether with hindsight it was an intelligent choice. The proper question is whether it would have been obvious for a chemist to prepare HCT if asked to solve the problem of finding a compound more potent than CT. To conclude hydrogenation of CT was an obvious solution to the problem, there must have been something in the prior art to suggest it would enhance CT's diuretic property.

In support of a finding of obviousness, the government offered the fact that, aside from Ciba, five other parties prepared HCT at about the same time as Ciba did. Simultaneous invention is "some evidence, cumulative to be sure" of the impact of the prior art on those of ordinary skill in the art. *Felburn v. New York Central R.R. Co.*, 350 F.2d 416, 426 (6th Cir. 1965), *cert. denied*, 383 U.S. 935, 86 S.Ct. 1063, 15 L.Ed.2d 852 (1966). However, it is not conclusive on the issue of obviousness. Experts from both sides testified that the results of hydrogenation were totally unpredictable and that there was nothing in the prior art to suggest that hydrogenation would improve CT. Such testimony sufficiently rebuts any inference of obviousness that could be drawn from a finding of simultaneous invention.

10. Actually, the Freeman-Wagner article calls for an *excess* of formaldehyde to be used. Ciba scientists used equimolar amounts of formaldehyde and disulfamyl precursor. Merck scientists had at one time attempted to make HCT using the excess amount of formaldehyde and failed.

11. It is significant, however, that hydrogenation is the type of change that can have a substantial effect on a molecule since it changes such things as the shape and basicity of the molecule.

In addition, it should be noted that HCT was not an obvious solution to Dr. Novello. Dr. Novello was the Merck scientist who, in 1956, invented and applied for a patent on CT, as well as on thousands of its analogs. After inventing CT, Novello explored its variations and made 100 to 200 compounds. Merck's research effort on diuretics during 1957–58 was headed by Novello who, assisted by a highly trained and motivated staff, was the most familiar with the prior art. Merck was interested particularly in finding a compound having the type of activity possessed by CT, but with greater potency because it considered the high dosage required for CT to be a limitation. The foregoing is persuasive circumstantial evidence that hydrogenation was not an obvious solution to the search for a more potent analog of CT.

Accordingly, in view of the fact that the results of hydrogenation were totally unpredictable and there was nothing in the prior art indicating that hydrogenation would improve CT's potency, there is no basis for concluding that HCT was structurally obvious.

## UNEXPECTED PROPERTY

HCT satisfies § 103 because its unexpected property (increased potency) confers the required degree of non-obviousness to an otherwise structurally obvious compound. This doctrine was espoused in the case of *In re Papesch, supra,* wherein Judge Rich explained:

> From the standpoint of patent law, a compound and all of its properties are inseparable; they are one and the same thing. The graphic formulae, the chemical nomenclature, the systems of classification and study such as the concepts of homology, isomerism, etc., are mere symbols by which compounds can be identified, classified, and compared. But a formula is not a compound and while it may serve in a claim to *identify* what is being patented, as the metes and bounds of a deed identify a plot of land, the *thing* that is patented is not the formula but the compound identified by it. And the

patentability of the thing does not depend on the similarity of its formula to that of another compound but of the similarity of the former compound to the latter. There is no basis in law for ignoring any property in making such a comparison. An assumed similarity based on a comparison of formulae must give way to evidence that the assumption is erroneous.

315 F.2d at 391 (emphasis in original).

This reasoning was expressly adopted in *Commissioner of Patents v. Deutsche Gold-und-Silber,* 397 F.2d 656 (D.C.Cir.1968). After quoting the above passage from *Papesch,* Judge (now Chief Justice) Burger added: "The sound reasoning of the *Papesch* case has been unanimously and repeatedly reaffirmed by the Court of Customs and Patent Appeals. Doubtless we must agree with admonitions against deciding questions of chemical obviousness on the basis of structure alone." 397 F.2d at 662. The Fifth Circuit also adopted the unexpected property standard. In *Eli Lilly & Co. v. Generix Drug Sales, Inc.,* 460 F.2d 1096 (5th Cir. 1972), that court explained:

> A limitation to "use" or process patentability, based solely on the existence of prior chemical formulations, would not accord with the basic constitutional power being exercised by the Congress to promote science and the useful arts. Such a niggardly patent reward for costly and painstaking research would discourage both the inspiration-perspiration process of the laboratory and the incentive to publicly disclose products of value to mankind.

460 F.2d at 1103. *See also Eli Lilly and Co. v. Premo Pharmaceutical, supra,* Slip Op. at 23.

Most recently (July 5, 1979), the United States Court of Customs and Patent Appeals reaffirmed the *Papesch* doctrine making it clear that a property of a compound cannot be ignored in the determination of non-obviousness. *In re Application of Barney J. Magerlein, supra,* 602 F.2d at 372. Both parties concede that the increased potency of HCT is an unexpected property.

The government contends that the unexpected property of HCT is an insignificant advance over CT and, therefore, is insufficient to confer non-obviousness upon HCT.

CT was a major breakthrough in the search for a potent, orally administrable, continuously effective, non-toxic diuretic. HCT, like CT, is also a very useful diuretic and antihypertensive agent. This is true not because of any difference between the two drugs, but rather because the drugs are similar in so many important ways. There is no significant difference between the diuretic, natriuretic, and saluretic effects of the two drugs. In equally potent doses, there is also no significant difference between CT and HCT as antihypertensive agents. CT and HCT are both extremely safe drugs.

The only significant difference between HCT and CT is that HCT is about 10 times more potent than CT. The greater potency of HCT means that it can be given in a smaller pill than can CT.

The primary benefit of the smaller pill is that it is much easier to swallow. In the field of hypertension, this convenience has important therapeutic ramifications. The pills are prescribed for long term use. The disease is usually asymptomatic generating a problem of getting the patients to take their medication regularly. Under such circumstances, a smaller pill has an important value in encouraging a larger number of patients to take medication. The higher potency of HCT also facilitates its use in combination with other drugs by alleviating the problem of pill size.

Whether these benefits are of sufficient value to confer non-obviousness to HCT is, of course, ultimately a question of line-drawing. Ciba cites several cases where an unexpected increased activity sufficed to render a structurally obvious compound non-obvious. *In re Wiechert*, 370 F.2d 927 (C.C.P.A.1967); *In re Wagner*, 371 F.2d 877 (C.C.P.A.1967); *In re Risse*, 378 F.2d 948, 958 (C.C.P.A.1967). These cases are not persuasive. There is no indication in them that the new and prior art compounds had the same ceiling or limitation on their dose-effect curves, as do HCT and CT. These cases may well have rested on the proposition that greater efficacy, not greater potency, can confer non-obviousness. There is a significant difference between these two terms. Greater potency only means that a smaller pill can be used, whereas greater efficacy refers to clinical superiority. Since the issue of whether greater potency is of sufficient value to confer non-obviousness is one of first impression, it is a useful indicator to look at the value placed on this unexpected property by the drug industry and medical community.

The industry was actively seeking a compound having greater potency than CT. It is reasonable to infer that the industry placed value on HCT's unexpected property. The medical community (*i. e.*, the doctors who prescribe diuretics), obviously believes there is value to a smaller tablet because *HCT outsells CT three to one* (Tr. 1505–17). In addition, the generic houses decided to market HCT, for which they pay Ciba a royalty, rather than CT which they could market free from royalty since Merck's patent on CT expired in 1974 (Tr. 1532–33). The conduct of the medical community and pharmaceutical industry clearly indicates that the increased potency of HCT is thought to be of considerable value.

Although Ciba's contribution with HCT may not have been as valuable as Merck's medical breakthrough with CT, it was significant, as evidenced by its overwhelming acceptance in the medical and pharmaceutical communities. It is not necessary for a drug to be a major medical breakthrough in order to be patentable. HCT offers substantially increased patient convenience in the treatment of an often asymptomatic disease that requires long term medication. This is a significant enough contribution to be deserving of a patent.

## C. FRAUD

The government contends that even if Ciba's patent is new, useful and non-obvious, it should be found invalid because it was procured by fraud.

■ In a challenge to the validity of a patent because of fraud or inequitable conduct in its procurement, two elements must be shown: (1) there must be a knowing, willful and intentional act of misrepresentation to the Patent Office, and (2) the misrepresentation to the Patent Office must be material. *Walker Process Equipment, Inc. v. Food Mach. and Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592 (3d Cir. 1972); *Meuller Brass Co. v. Reading Industries, Inc.*, 352 F.Supp. 1357 (E.D.Pa.1972). A misrepresentation is material if the patent would not have issued "but for" the omission. *Walker, supra; Meuller, supra.* The burden of proof is by clear and convincing evidence. *In re Multidistrict Litigation Involving Frost Patent,* 540 F.2d 601 (3d Cir. 1976).

■ The government contends that *Monsanto, supra,* is controlling and mandates a finding of fraud in this case. The Third Circuit in *Monsanto* perceived the test for misrepresentation in patent infringement cases to be that set forth in *Precision Co. v. Automative Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Quoting from that decision, the *Monsanto* Court stated: "The guiding doctrine in this case is the equitable maxim that 'he who comes into equity must come with clean hands.'" 456 F.2d at 598.

The *Monsanto* case is inapposite. In *Monsanto*, the court was dealing specifically with the enforcement of a patent in a patent infringement case. Here, on the other hand, the issue is patent validity arising out of a defense to an antitrust charge. Ciba is not requesting the court to use its equitable power to enforce its patent. Rather, Ciba is relying upon its patent as a shield to an antitrust suit. Therefore, the relevant decisions are *Walker* and *Meuller*, in which the patent issue, as here, arose out of a defense to an antitrust charge.

Assuming, *arguendo*, that *Monsanto* is applicable, it would not be persuasive authority for finding fraud. Monsanto's conduct in presenting its patent application to the Patent Office, which the Third Circuit concluded transgressed equitable standards

of conduct, was, by far, more egregious than Ciba's conduct herein.

Monsanto represented that its compound 3,4–DCPA had unusual and valuable herbicidal activity and that the activity of this compound was surprising because related compounds possessed little or no herbicidal efficiency. Monsanto submitted the affidavit of Dr. Husted to the Patent Office supporting this representation. However, the Husted affidavit contained fewer than 25% of the results from the tests Dr. Husted performed; *i. e.*, of the 899 tests, only 110 were submitted. Monsanto knew from the data withheld that the representation set forth in the affidavit was false. The Third Circuit also concluded that the success of Monsanto's application was directly attributed to the fact that the Husted Report emphasized that the compound possessed properties of surprising herbicidal efficiency.

The government also argues, relying principally on dicta in the District Court opinion, *Monsanto Co. v. Rohm & Haas Co.*, 312 F.Supp. 778 (E.D.Pa.), that the patentee's duty to disclose should require the highest degree of candor. *Id.* at 793. The government analogizes this duty to the standard of disclosure required by the Supreme Court for a seller of securities to the public. The Supreme Court in *TSC Industries v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) held that a fact omitted from a proxy statement "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote," not that he would have changed his vote "but for" the omission.

The government's proposed standard will not be applied to a situation where patent validity is raised as a defense in an antitrust suit. To hold that an antitrust suit might reach an otherwise valid patent merely because the patent was procured with less than the highest degree of candor and fiduciary duty would chill the disclosure of inventions through obtaining a patent due to fear of the vexatious or punitive consequences of antitrust suits. The "but

for" standard of materiality properly balances the competing policies of the antitrust and patent laws. *See Walker, supra,* 382 U.S. at 180, 86 S.Ct. at 351 (Harlan, J., concurring).

The Patent Office initially rejected Ciba's claims on the ground that HCT was structurally obvious in view of the prior art references: Novello Patent on CT and the Freeman-Wagner Article. Ciba contested this rejection by filing several affidavits asserting that HCT had unexpected properties which could confer non-obviousness to an otherwise structurally obvious compound. (Ciba, of course, also reasserted that HCT was not structurally obvious.)

The government maintains that while there were no affirmative misstatements in the affidavits, they were nonetheless misleading because of the omissions. This court finds that the government has not met its burden to show by clear and convincing evidence, that Ciba intentionally and in bad faith withheld the information. In addition, this court finds that the omissions were immaterial.

### THE POTENCY AFFIDAVIT

Ciba submitted the affidavit of Dr. Plummer establishing that HCT was eight times more potent than CT in tests Ciba had conducted in animals. The government does not dispute the fact that HCT is 8–10 times more potent than CT. The government contends that the affidavit was misleading because Ciba omitted the fact that CT and HCT have the same dose effect curves, *i. e.,* if each is administered in its maximal effective dosage each has the same efficacy. The government argues that increased potency would imply increased efficacy to the patent examiner unless he was specifically told otherwise. Notwithstanding the fact that Ciba knew CT and HCT had common efficacy ceilings, the government cannot impute bad faith to Ciba for omitting this fact on the assumption the patent examiner was laboring under the misconception that increased potency implies increased efficacy. Both the government expert, Dr. Burns, and Ciba's

expert, Dr. Taylor, testified that potency and efficacy are independent characteristics of drugs, and knowledge of one does not imply anything about the other.

In addition, the patent is not invalid for fraud since omission of the fact that HCT and CT had a common efficacy ceiling is immaterial. It cannot be said that a patent would not have issued but for the belief that HCT had increased efficacy since, as discussed earlier (*see* pp. 22–23), increased potency alone is sufficient to impart non-obviousness.

### TOXICITY AFFIDAVIT

Together with the potency affidavit, Ciba submitted a toxicity affidavit. Ciba ran a very rough toxicity study on rats and concluded HCT was approximately half as toxic as CT. Not only was the accuracy of this study questionable, it was of minimal significance because CT was already known to be of extremely low toxicity. However, there can be no bad faith attributable to Ciba for submitting this affidavit because the shortcomings of this affidavit were apparent on its face.

Four months after the submission of the toxicity affidavit to the Patent Office, Merck conducted toxicity experiments between CT and HCT and concluded CT was half as toxic as HCT. The government contends that Ciba acted fraudulently in not bringing this new information to the attention of the Patent Office. Assuming, *arguendo,* that Merck's study was more reliable than Ciba's, the issue of which compound is less toxic is irrelevant and immaterial to the issuance of the patent because both are indisputedly of extremely low toxicity.

### THE RICHTERICH ARTICLE

The government alleges that Ciba was obligated to call to the attention of the Patent Office the Richterich article. Dr. Richterich concluded an article by stating that CT enzymatically converted to HCT *in vivo.* If this hypothesis had been true, then HCT already existed and Ciba's patent

might fail on the grounds that it was not novel under 35 U.S.C. § 101.[12]

Richterich based his hypothesis on the erroneous premise that HCT and CT had an identical electrolyte pattern for Na and Cl. From this premise he theorized that a common active agent could be involved, as if CT were converted in the body to HCT. Ciba knew that HCT and CT did not have an identical electrolyte pattern. From this, Ciba appreciated the different mode of action between HCT and CT; HCT having one-tenth of the carbonic anhydrase inhibitor effect of CT. Indeed, when Richterich later learned of this electrolyte pattern of HCT and CT he withdrew his hypothesis that CT converted into HCT.

There is no fraud for omitting an article that Ciba in good faith believed was erroneous. In *United States v. Standard Electric Time Co.*, 155 F.Supp. 949, 952 (D.Mass. 1957), *appeal dismissed*, 254 F.2d 598 (1st Cir. 1958), Judge Wyzanski stated in pertinent part:

> [T]he applicant has no duty to cite every publication of which he knows, or which he has used, merely because the publication is one likely to be referred to by a vigilant examiner in the Patent Office, or by a rival in an interference or other proceeding. It is not the object of the quoted statute or rule to supply all available evidence to the Patent Office, or to force the applicant to set up what he regards in good faith as straw men which he reasonably and in good faith believes he can knock down.

155 F.Supp. at 952. Further, this article could not be material to the validity of a patent because it is untrue.

## CLAIMS 1 AND 2.

Finally, the government argues that Ciba misrepresented to the Patent Office that HCT's diuretic potency was representative of the potency of the thousands of analogs

that Ciba described in claims 1 and 2 of its patent application. The government referred specifically to a supplemental amendment in which Ciba stated: " . . . the compounds of the invention are effective in an amount about ⅒ of that used with CT." (Emphasis added.) (GX 1207A) This is an incorrect statement. While every compound that Ciba tested within the scope of claims 1 and 2 was diuretically active, the activities of these compounds varied—a number were found to be more active than HCT, and a number were found to be less active than HCT, and some of the latter group were also less active than CT. But of the compounds tested, they were all 10 times more potent than their corresponding unsaturated analog.

There is no basis for finding the patent examiner relied on the error. The incorrect amendment referred specifically to affidavits in which only the compounds HCT and CT were compared. It is not credible that the examiner would assume that Ciba was representing that all those compounds were 10 times more active than CT itself. It is more logical to conclude that the examiner assumed that Ciba was representing that each HCT analog was 10 times more potent than the corresponding CT analog.

In addition, this misrepresentation is totally immaterial. A patent undoubtedly would have issued on the mere fact that all the claimed analogs demonstrated at least some of HCT's activity. *See In re Gardner*, 475 F.2d 1389, 1392 (C.C.P.A.1973).

## CONCLUSION

Ciba's patent on HCT satisfies 35 U.S.C. § 103. It is not structurally obvious under the reasoning of *In re Stemniski*. Moreover, the unexpected property of increased potency conferred non-obviousness to HCT under the standard set forth in *In re Papesch*.

12. While Ciba could claim HCT in pure form, thereby complying with the requirements of 35 U.S.C. § 101 and § 102 by distinguishing over the form in which it exists in the human body, it still must be shown that the new product as claimed is patentable under § 103, *i. e.*, that

there is some beneficial unexpected property of the pure form product as compared to the form in which it exists in nature. *In re King*, 107 F.2d 618 (C.C.P.A.1939); *Sterling Drug, Inc. v. Watson*, 135 F.Supp. 173 (D.D.C.1955).

Ciba's patent on HCT is not invalid on the grounds that it was procured by fraud. The government has not demonstrated by clear and convincing evidence that Ciba omitted the allegedly misleading facts intentionally and in bad faith. Furthermore, the omitted facts were immaterial to the issuance of the patent.

Accordingly, this Court holds Ciba's '645 Patent to be valid. The parties shall submit an appropriate order with consent as to form, if possible, within 10 days.

## FINAL JUDGMENT

Plaintiff, United States of America, having filed its complaint herein on July 9, 1969, defendant having filed its answer thereto, the trial having been bifurcated, the Court having rendered its opinion on the antitrust issues on April 15, 1976 and its opinion on the patent issues on August 7, 1979, the Court having entered a Final Judgment on October 16, 1979, plaintiff having filed an appeal from the Final Judgment, defendant having filed a cross-appeal, upon joint application of the parties, both appeals having been dismissed and the action having been remanded to this Court, plaintiff and defendant, by their respective attorneys, having consented to the entry of this Final Judgment without it constituting any evidence against or admission by any party with respect to any issue of fact or law herein;

NOW, THEREFORE, without final adjudication of any issue of fact or law herein and upon consent of the parties hereto, it is hereby,

ORDERED, ADJUDGED, AND DECREED as follows:

### I

This Court has jurisdiction of the subject matter of this action and of each of the parties consenting hereto. The complaint states a claim upon which relief may be granted against defendant under Section 1 of the Sherman Act (15 U.S.C. § 1).

### II

The Final Judgment entered on October 16, 1979 is vacated, and this Final Judgment is substituted therefor.

### III

As used in this Final Judgment:

(A) "Ciba" means defendant Ciba-Geigy Corporation, a corporation organized and existing under the laws of the State of New York; and any subdivision, subsidiary, or affiliate thereof.

(B) "Hydrochlorothiazide" means 6-chloro-7-sulfamyl-3,4-dihydro-1,2,4-benzothiadiazine-1,1-dioxide.

(C) "Hydrochlorothiazide Combination Patents" means United States Patent Nos. 3,379,612, 3,499,082, and 3,515,786.

(D) "Hydrochlorothiazide Patent" means United States Patent No. 3,163,645.

(E) "Person" means any individual, partnership, association, firm, corporation, proprietorship, joint venture, or other legal or business entity.

### IV

This Final Judgment applies to defendant and to its officers, directors, agents, employees, subsidiaries, successors, and assigns, and to all other Persons in active concert or participation with any of them who shall have received actual notice of this Final Judgment by personal service or otherwise.

### V

(A) Ciba is ordered and directed upon the request of any of its existing licensees under the Hydrocholorothiazide Patent to extend the licensee's license thereunder to include the right to make, have made, use, and sell Hydrocholorothiazide in combination with any one or more other therapeutically active ingredients selected by the licensee. The royalty rate for the extended license shall be no more than the royalty rate specified in the license at the time of the request. Ciba shall notify each of its existing licensees under the Hydrochloro-

thiazide Patent whose license may be extended pursuant to this Subsection V(A) of its rights under this Subsection V(A).

(B) Ciba is ordered and directed to grant any financially responsible Person making written application therefor ·an unrestricted, nonexclusive license under the Hydrochlorothiazide Patent to make, have made, use, and sell Hydrochlorothiazide alone and in combination with any one or more other therapeutically active ingredients selected by the licensee. The royalty rate for the license shall be reasonable, but in no event more than six (6) percent.

(C) Nothing in this Final Judgment shall prevent any Person from attacking at any time the validity or scope of the Hydrochlorothiazide Patent or shall require Ciba to grant or extend any license under any patent other than the Hydrochlorothiazide Patent.

## VI

Ciba is ordered and directed at or about the date of entry of this Final Judgment to file with the United States Patent Office pursuant to Section 253 of the Patent Laws (35 U.S.C. § 253) a terminal disclaimer of:

(A) Claims 1, 2, 40, and 41 of the Hydrochlorothiazide Patent for the part of their term remaining after the date of entry of this Final Judgment.

(B) Claim 3 of the Hydrochlorothiazide Patent for the part of its term remaining after March 31, 1981.

(C) Each of the Hydrochlorothiazide Combination Patents for the part of its term remaining after March 31, 1981. Ciba shall furnish plaintiff copies of all terminal disclaimers Ciba files with the United States Patent Office pursuant to this Section VI.

## VII

For the purpose of determining or securing compliance with this Final Judgment, and subject to any legally recognized privilege, from time to time:

(A) Duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General or of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendant made to its principal office, be permitted:

(1) Access during office hours of defendant to inspect and copy all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of defendant, who may have counsel present, relating to any matters contained in this Final Judgment; and

(2) Subject to the reasonable convenience of defendant and without restraint or interference from it, to interview officers, employees and agents of defendant, who may have counsel present, regarding any such matters.

(B) Upon the written request of the Attorney General or of the Assistant Attorney General in charge of the Antitrust Division made to defendant's principal office, defendant shall submit such written reports, under oath if requested, with respect to any of the matters contained in this Final Judgment as may be requested.

No information or documents obtained by the means provided in this Section VII shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the United States, except in the course of legal proceedings to which the United States is a party, or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

(C) If at the time information or documents are furnished by defendant to plaintiff, defendant represents and identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and defendant marks each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then ten (10) days notice shall be given by plaintiff to

defendant prior to divulging such material in any legal proceeding (other than a grand jury proceeding) to which defendant is not a party.

### VIII

This Final Judgment will expire on December 31, 1981.

### IX

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of the provisions hereof, for the enforcement of compliance herewith, and for the punishment of any violation hereof.

Entry of this Final Judgment is in the public interest.